**BISGAIER HOFF, LLC**
**By:**     James A. Kozachek, Esquire (JAK 5657) - jkozachek@bisgaierhoff.com
**21 Tanner Street**
**Haddonfield, NJ 08033**
**Telephone:  (856) 795-0150**
**Facsimile:  (856) 795-0312**
**Attorneys for Plaintiffs Michael S. Rothberg and Theresa Rothberg**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **MICHAEL S. ROTHBERG and THERESA ROTHBERG,**<br><br>            **Plaintiffs,**<br><br>                     **v.**<br><br>**SARANNE ROTHBERG MARGER, individually and as Administratrix of the ESTATE OF SIDNEY ROTHBERG, THE ESTATE OF SIDNEY ROTHBERG, NELLIE INGRAM, ALAN MARKOVITZ, ESQ., MARK JONES, WACHOVIA BANK, NA and its successor, WELLS FARGO BANK, GEORGE BRANDT, NORTH FORK BANK and its successor, CAPITAL ONE BANK, JOHN and JANE DOES, 1 through 20 and ABC CORPORATIONS, A through Z.**<br><br>            **Defendants.** | : : : : : : : : : : : : : : : | **CIVIL ACTION NO:** _____<br><br>**JURY TRIAL DEMANDED**<br>**(Electronically Filed)** |

---

### COMPLAINT OF MICHAEL S. ROTHBERG and THERESA ROTHBERG

---

Plaintiffs Michael S. Rothberg ("Rothberg" or "Michael") and Theresa Rothberg

("Theresa") (collectively "Rothbergs" or "Plaintiffs"), by way of Complaint against Saranne

Rothberg Marger ("Marger"), both individually and as Administratrix of the Estate of Sidney

Rothberg, the Estate of Sidney Rothberg ("Estate"), Nellie Ingram ("Ingram"), Alan Markovitz,

Esq. ("Markovitz"), Mark Jones ("Jones"), Wachovia Bank, NA (now Wells Fargo)

("Wachovia/Wells Fargo"), George Brandt ("Brandt"), North Fork Bank (now Capital One

Bank) ("North Fork/Capital One"), John and Jane Does, 1 through 20 and ABC Corporations A through Z (collectively "Defendants") hereby state as follows:

## PARTIES

1.      Plaintiffs Michael S. Rothberg and Theresa Rothberg are residents of New Jersey, with an address of 268 Myrtle Avenue, Woodbine, NJ 08270.

2.      Plaintiff Michael S. Rothberg is the oldest son and an heir of Sidney Rothberg, a creditor of the Estate and a signatory to a May 30, 2008 Assignment of Interest in Agreement of Sale ("Assignment"), the consideration for which he was not paid. Plaintiff Michael Rothberg is blind, impairing his ability to review documents. Michael was a regular beneficiary of Sidney's largesse and Sidney Rothberg's expressed desire to ensure that Michael was cared for throughout his entire life.

3.      Plaintiff Theresa Rothberg is a signatory to the Assignment, the consideration for which she has not been paid. Theresa Rothberg has been part of Michael's life for over twenty (20) years and assisted Michael in caring for himself, due to his disability, and further assisted Michael in caring for Michael's father Sidney, and was a regular beneficiary of Sidney's largesse while Sidney Rothberg was alive. Theresa Rothberg is also disabled.

4.      Defendant Marger is a resident of the State of New York, at 200 East 57th Street, Apt. 3B, New York, NY 10022.

5.      Defendant Marger was at all times relevant to this matter, the youngest daughter and an heir of Sidney Rothberg and has been exercising complete control of all the considerable assets of Sidney Rothberg from a time prior to his death on May 13, 2008, through the date of the filing of this Complaint.

6.      Defendant, the Estate of Sidney Rothberg ("Estate"), is a party in interest and is currently being administered in the Philadelphia Court of Common Pleas, Orphans Court Division, Case ID Number 673AP of 2009 ("Philadelphia Orphans Court Action") where Defendant Marger

has asserted jurisdiction exists based upon her certified claim that Sidney Rothberg was domiciled in Philadelphia. That probate matter is currently being contested by Rothberg and Lynn Rothberg Kearney ("Kearney"), who asserts that she is the oldest daughter of Sidney Rothberg and Rothberg's and Marger's oldest sister. Kearney has received nothing from the Estate.

7.      Defendant Nellie Ingram ("Ingram") is a resident of Pennsylvania, with an address of 5308 Catharine St., Philadelphia, PA 19143-2606, and worked as Sidney's housekeeper from 1978 through 2000 and then worked for Marger from 2006 forward. Ingram was responsible for, among other things, misrepresenting or omitting details of Marger's Estate activities to Sidney, destroying Estate documents and taking Estate property at which time Ingram was acting in her own capacity and as an employee of Sidney, Marger and the Estate's.

8.      Defendant Alan F. Markovitz, Esq., ("Markovitz") is an attorney at law in the Commonwealth of Pennsylvania, with an address of 254 Philip Pl., Philadelphia, PA 19106-3902, and an office address of 150 Monument Rd., Bala Cynwyd, PA 19004. Markovitz was the attorney for Marger and the Estate, working with Marger to misappropriate Estate assets as well as to create legal documents to further Marger's objectives of concealing and misappropriating Estate assets to which Plaintiffs and others were entitled.

9.      Defendant Mark Jones ("Jones"), with a business address of 123 S. Broad St., Philadelphia, PA 19109, worked for Wachovia Bank, NA and then Wells Fargo as a regional bank manager. Jones was instrumental in carrying out Marger's unauthorized transfers of Estate assets and funds from the Estate to Marger, as well as creating false signature cards at Marger's request and worked to deprive the Estate of assets to which heirs, beneficiaries and creditors, including Plaintiffs, were entitled.

10.     Wachovia Bank, NA and its successor, Wells Fargo Bank ("Wachovia/Wells Fargo"), through the person of Mark Jones and others, at their location of 123 South Broad Street, Philadelphia, PA 19109, worked to deprive the Estate of assets to which heirs, beneficiaries and

3

creditors, including Plaintiffs were entitled.  The registered agent for service of process in New

Jersey for  Wachovia/Wells Fargo is the Corporation Service Company, 830 Bear Tavern Road,

West Trenton, NJ 08628.

11.     Defendant George Brandt ("Brandt"), worked for North Fork Bank and then Capital

One Bank, in their location at 643 Lexington Avenue, New York, NY 10022.  Brandt was

instrumental in carrying out Marger's unauthorized transfers of Estate assets from Sidney

Rothberg to Marger and her daughter, Lauriel, and worked to deprive the Estate of assets to which

heirs, beneficiaries and creditors, including Plaintiffs, were entitled.

12.     Defendants North Fork Bank and its successor, Capitol One ("North Fork/Capital

One"), through the person of George Brandt, and through their location at 643 Lexington Avenue,

New York, NY 10022, worked with Marger to deprive the Estate of assets to which heirs,

beneficiaries and creditors, including Plaintiffs, were entitled.  The registered agent for service of

process in New Jersey for North Fork/Capital One is the Corporation Service Company, 830 Bear

Tavern Road, West Trenton, NJ 08628.

13.     John and Jane Does 1 through 20 are persons operating in New York, New Jersey,

Pennsylvania, Great Britain, Switzerland, and the European Union, who have seized, concealed,

disposed of and/or otherwise tortiously interfered with assets of the Estate to which heirs,

beneficiaries and creditors, including Plaintiffs, are entitled and/or conspired with Marger to

deprive the Estate of its assets for the John and Jane Does' benefit.

14.     ABC Corporations A through Z are corporations, partnerships or other entities in

New York, New Jersey, Pennsylvania, Great Britain, Switzerland, and the European Union, which

have seized, concealed, disposed of and/or otherwise tortiously interfered with assets of the Estate

to which heirs, beneficiaries and creditors, including Plaintiffs, are entitled and/or conspired with

Marger to deprive the Estate of its assets for the ABC Corporations' benefit.

4

## JURISDICTION and VENUE

15.     The matter in controversy in this action exceeds the sum or value of $75,000.00.

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, as the Plaintiffs are residents of New Jersey, and the Defendants are citizens of other states, namely New York and Pennsylvania.

17.     Plaintiff also asserts this Court's jurisdiction under 28 U.S.C. § 1331.

18.     Plaintiff also asserts this Court's jurisdiction under 28 U.S.C. § 1367.

19.     Venue is proper under 28 U.S.C. § 1391 as: (a) Plaintiffs are citizens of and reside in New Jersey, (b) Defendant Marger has caused substantial assets of the Estate to be relocated to New Jersey; (c) at the time of his death, Sidney Rothberg was a resident of New Jersey; and (d) vast portions of the Estate's assets are currently situated in New Jersey (though other portions remain in New York and Pennsylvania), including all the assets of SMR, Inc., a New Jersey corporation formed by Sidney Rothberg ("Sidney") in the 1970s, located in Camden, New Jersey, for the purpose of buying and selling artwork, in which Sidney owned a 50% interest, Marger a 25% interest and Rothberg the remaining 25% ("SMR").

20.     This Court's jurisdiction in this matter does not interfere with the jurisdiction of the Pennsylvania state court to probate or annul the Testator's will and administer the decedent's Estate and is specifically authorized under the United States Supreme Court's decision in Marshall v. Marshall, 547 U.S. 293 (2006).  The purpose of this litigation is simply to establish claims against the Defendants, including the Estate, but not to interfere with the Philadelphia Orphans Court Action.

## FIRST COUNT
### (Breach of Fiduciary Duty against Marger)

21.     Plaintiffs integrate by reference all allegations previously set forth in this Complaint as if fully stated herein.

22.     Sidney Rothberg was born December 17, 1924 and died May 13, 2008.

23.     Sidney and his wife Marybeth Rothberg raised two children, Michael S. Rothberg and Saranne Rothberg Marger, until Sidney and Marybeth separated.

24.     There is a pending claim by Lynn Rothberg Kearney that Sidney is her father and that she was born prior to Sidney's marriage to Marybeth Devins.

25.     Based on information and belief, in the mid 1970s, Sidney Rothberg had Marvin Wallen, Esq., of Wallen and Wallen, 1125 Atlantic Avenue, Suite 421, Atlantic City, NJ 08401, prepare a last will and testament leaving the entirety of his estate to Rothberg and Marger equally, which interest was not to be conveyed to them until they reached the age of fifty (50), and which made his brother, Gerald Rothberg, the Administrator (the "1970s Will").

26.     Throughout his adult life, Rothberg was given regular gifts by his father including, without limitation, $40,000 on each birthday, regular vacations to Europe and other places, monthly stipends of between $5,000 and $10,000, a full and complete wardrobe of expensive clothing, cost-free room and board at all times and periodic and substantial gifts of money and other things.

27.     In 1993 through 1994, Rothberg, Marger and Sidney Rothberg were all living in close proximity to one another in New York City.

28.     In early 1994, Sidney Rothberg, then 69 years old, was still active as a commodities trader on Wall Street.

29.     In early April 1994, Sidney Rothberg complained of back pain in a telephone conversation with Rothberg regarding a dinner engagement planned for that evening.

30.     Plaintiffs arrived at Rothberg's father's home and then called Defendant Marger.

31.     Plaintiffs and Marger argued about what would be the appropriate care for Sidney, with Plaintiffs in agreement with Sidney and Marger opposing their wishes.

32.     Sidney Rothberg was taken to see Dr. Jeffrey W. Moses, with a current office address of 173 Fort Washington Avenue, New York, NY, 10032, the next day and then went to the hospital, with Dr. Moses' encouragement.

33.     During Sidney's hospital stay, Dr. Moses prescribed and Sidney underwent a coronary angioplasty procedure.  He was eventually heavily medicated, sedated, vulnerable and susceptible, when he was returned to Marger's New York residence where it was intended he would stay until he had recovered.

34.     Marger had called Nellie Ingram, Sidney's house keeper, from Philadelphia to New York to help Marger.

35.     It was at this time, while heavily medicated, sedated, vulnerable and susceptible, that Marger extracted the first of the alleged modifications of the 1970s Will (a one-page purported will witnessed only by Nellie Ingram, Marger's co-conspirator and a beneficiary) in New York, leaving a painting to Rothberg, a sum of cash to Nellie Ingram and everything else to Marger alone (the "1994 Will").

36.     The 1994 Will was never shared with anyone, is not properly witnessed or notarized and is another example of Marger's efforts to breach her obligations to Rothberg and misappropriate assets of the Estate to which Rothberg was entitled.

37.     From that point forward Sidney rejected the 1994 Will stating in no uncertain terms that it had been a mere "codicil" to the 1970s Will and that "it no longer existed."

38.     A year or two later, Sidney executed another will document speaking to the distribution of two sculptures (one of which was to go to Rothberg and the other to Marger) (the "1995 Will"). This document was witnessed only by Joseph Marger, then Marger's husband, is later in time and is contrary to any alleged expression of intent contained in the 1994 Will obtained by Marger, in that it evenly divides two comparable statues in Sidney's collection between Marger

7

and Rothberg, consistent with Sidney's governing and often expressed intentions to evenly divide his Estate between Rothberg and Marger.

39.     From the time in 1994 while Sidney was recovering at Marger's residence in New York, through to the time of Sidney's death in 2008, Marger took increasingly greater levels of control over Sidney Rothberg's substantial fortune (then estimated to be valued at somewhere between $100,000,000.00 and $200,000,000.00).

40.     While he was under significant levels of medication and sedation, Marger had Sidney execute documents, including the unenforceable 1994 Will and an alleged, though never presented, power-of-attorney, to provide her some indicia of authority for her efforts to misappropriate all of Sidney's assets and to cut Rothberg off from his rightful interest in the assets of the Estate.

41.     In 2002 Marger had a second alleged single page testamentary document prepared, typed and then allegedly signed by Sidney and witnessed by the doorman at Sidney's New York residence, Douglas Rouche (the "2002 Will").

42.     The simple typed one-page 2002 Will, leaves $5,000 to Nellie Ingram, a particular painting, or a stated cash equivalent if the painting was no longer in the possession of the Estate, and the interest on $120,000 in bonds until they matured and then the full amount of the bonds once they matured to Rothberg, with the remaining tens, if not hundreds of millions of dollars, in artwork, jewelry, collectables, rugs, rare books, gold, silver, real property, personal possessions, stocks, bonds, certificates of deposit and other securities, among other things, going to Marger alone.

43.     Mr. Roche has confirmed that he simply signed a single paper without ever having read or seen what was on that paper and that as far as he knows the paper he signed could have been blank.

44.     Despite Mr. Roche's firm recollection that he signed only a single piece of paper, Marger has provided a second piece of paper that Roche allegedly witnessed, from the same period of time purportedly speaking to Sidney's intentions with respect to his health care (the "Health Care Proxy").

45.     The Health Care Proxy provides that only Marger can make health care decisions for Sidney and that Rothberg should not be allowed to do so.

46.     Despite a lengthy history of having legal advisors prepare all his agreements and other legal documents to ensure they were enforceable, and despite the fact that Sidney Rothberg had a plethora of legal advisors who could easily have been consulted, Marger's 2002 Will and her Health Care Proxy were only one page, were prepared without the usual consultation with attorneys, and have been advanced by Marger for the inherently suspect purpose of procuring virtually all the assets of a multimillion dollar Estate and depriving Rothberg of any entitlements he had reason to expect based on a lifetime of assurances from Sidney that he had evenly divided his Estate between Marger and Rothberg.

47.     At or around the time of the creation of the 2002 Will and Health Care Proxy, and at Marger's request, Sidney loaned Marger's boyfriend, Simon Andrews, $300,000 for Andrew's business, Right Track Studios, in New York, NY (the "Loan Agreement").

48.     The Loan Agreement was a complicated multipage document with a confession of judgment, a mortgage note, strict financing terms, transfers of shares in the company and interest paid up-front.

49.     It was not Sidney's pattern, practice or custom to create any legal documents of any kind whatsoever, without following all legal forms including, without limitation, using qualified legal counsel to prepare the documents, ensuring that all necessary parties were fully informed of the document's provisions, ensuring all signatures were fully and properly witnessed and notarized and all necessary originals and copies were filed, preserved and circulated.

50.     The only exception to Sidney's practice was under extremely emergent circumstances (e.g. an agreement he made on the commodities trading floor with a colleague who came to him for help in an emergency) and even that agreement was very sophisticated with clear and draconian terms in Sidney's favor.

51.     It was never Sidney's intention to give the bulk of his estate to Marger.

52.     If that had been his intention, his pattern, practice and custom would have dictated it be done in a proper form prepared by attorneys, knowledgeable and experience in tax, trusts and estates law.

53.     Based on information and belief, Marger simply Sidney to sign a blank piece of paper, then witnessed by Roche, his doorman, that Marger then subsequently typed with the text of the 2002 Will in order to breach her obligations to the beneficiaries, heirs and creditors of the Estate, including Rothberg, to tortiously interfere with Rothberg's entitlements and to misappropriate the assets of the Estate without Sidney's authorization, consent or knowledge.

54.     Marger's efforts to use undue influence to gain whatever documents she wanted from Sidney resulted in documents that were of questionable veracity and subject to challenge, because Marger, lacking Sidney's sophistication and experience, but with the capacity to unduly influence Sidney, obtained signatures from Sidney without explaining what she really wanted them for, prepared inadequate documents for him to sign, or Sidney, being infirm, heavily medicated and susceptible, did not know what he was signing and believed his daughter, who he had at some point given a limited power of attorney allowing her to pay his bills with a comparatively modest power-of-attorney account ("POA") containing $100,000, needed his signature for some document within her limited power to pay his bills.

55.     Regardless of the circumstances surrounding the creation of the 2002 Will, the fact remains that it was never Sidney's intent to do anything but divide his Estate evenly between Marger and Rothberg.

10

56.     Indeed, when asked, Sidney stated that the 2002 Will never existed.

57.     Marger was fully aware of Sidney's intention to divide the Estate evenly between them and so took unlawful steps to deprive Rothberg of his interest.

58.     Nothing in the 2002 Will or in any other document presented in any way changes Rothberg's share of one of Sidney's companies, SMR, Inc.

59.     Sidney's company, SMR, continued to buy and sell artwork and available records indicate that transactions continued through at least 2003. Rothberg continues to have a 25% interest in all SMR holdings which, to this date, Marger has refused to account for and pay to him in breach of her fiduciary obligations as Administratrix of the Estate.

60.     From 2003 through 2006, Sidney was still living in New York City, being visited regularly by Plaintiffs, but with Marger taking greater and greater amounts of control of Sidney's assets through, among other things, the limited POA Sidney had given to her for the limited purpose of paying his bills, for which she was well compensated.

61.     In February 2007, Sidney was still living in New York City with Marger having taken control of his health, care and maintenance, as a compensated employee or independent contractor.

62.     In late February 2007, after having dined with Plaintiffs, Plaintiffs brought Sidney back to his home in New York City. Plaintiffs did not go into his condominium, but socialized with Sidney in the lobby for a period of time and then departed.

63.     Based on information and belief, at some time within a day or so of Plaintiffs' dinner with Sidney, Sidney fell in his residence and apparently was unable to move. Marger, who had exclusive control over Sidney, his health, care and condition, failed to check on her father during the next week and when he was finally discovered, he had to be taken directly to the hospital.

64.     Marger refused to talk to Plaintiffs about Sidney and refused to let them know where he was, but, based on information and belief, he was taken to a local hospital in New York City (possibly Weill Cornell Medical Center, 525 East 68th Street, New York, NY 10065), then to Care One at Dunroven, 221 County Road, Cresskill, NJ 07626.

65.     Again, without consulting or advising Plaintiffs, Marger moved Sidney to the Jewish Home at Rockleigh, Russ Berrie Home for Jewish Living, located at 10 Link Drive in Rockleigh, New Jersey ("Jewish Home"), on May 11, 2007, where he remained for almost a year.

66.     Marger used her efforts and experience with subterfuge, deception and concealment to hide their father from Rothberg for more than seven (7) months, before Rothberg was finally able to convince Ingram to tell him where Marger had taken their father.

67.     Upon finding Sidney, Plaintiffs immediately called and arranged to visit him.

68.     Aware that Plaintiffs had contacted Sidney, Marger asked the staff at the Jewish Home to physically prevent Plaintiffs from seeing Sidney when Plaintiffs arrived.

69.     After speaking with Plaintiffs, the staff realized that Marger's request had no basis and was improper, allowing Plaintiffs to proceed to visit with Sidney.

70.     Thereafter Plaintiffs went to visit Sidney regularly, initially visiting him two times a week for twelve hours each day, then four times a week for twelve hours each day and then twelve hours or more each day 5 days a week, staying overnight at least four days each week.  All of these visits were at Sidney's express request.

71.     Marger also used undue influence, fraud and misrepresentation to try to prevent their father from receiving any visitors while Sidney was at the Jewish Home.

72.     Based on information and belief, Lynn Rothberg Kearney, who had been looking for Sidney Rothberg for over three years, journeyed to New Jersey in the Autumn of 2007 to try and locate him.  When she approached Marger to inquire about Sidney, Marger tried to have her arrested misrepresenting to the police that Marger had a restraining order against Kearney, which

12

she did not, in furtherance of her efforts to isolate Sidney from anyone who could complicate her efforts to misappropriate the entire Estate.

73.     Despite Marger's efforts to try and isolate Sidney, Plaintiffs had proven successful in reaching out to Sidney and were able to spend time with him and care for him.

74.     During their time working with and for Sidney at the Jewish Home, Plaintiffs were regularly complimented by the staff, who believed Sidney's care had taken a remarkable turn for the better due to Michael and Theresa Rothberg's time with him, lamenting the fact that under Marger's care he had virtually no visitors and his condition had been deteriorating.

75.     During this time Sidney regularly demanded or ordered Michael and Theresa to remain with him at all times.

76.     While Michael was caring for Sidney, in October 2007 (around the same time that Marger was attempting to have Lynn Rothberg Kearney arrested), Sidney made clear and certain express promises to Michael saying that he was giving him his New York residence at 66th Street together with all of its contents ("66th Street").

77.     During this time together with his father, Michael helped his father buy and sell stocks, CDs, reverse convertibles and other securities ("Trading"), which Sidney very much enjoyed, having spent the entirety of his adult life engaged in Trading, and during that process Rothberg learned that his father was working with over $17 million in available liquid assets.

78.     In January or February 2008, while they were working together, Sidney promised Michael that he would give him the $5.5 million contained in UBS brokerage account that was part of the $17 million with which Sidney was Trading (the "UBS Account").

79.     At this time, Sidney regularly asked for Michael's social security number, as he had since 2003, so that he could transfer promised amounts to an account or accounts in Michael's name or to certificates of deposit, "pay on death," to Michael Rothberg.

80.    Sidney also regularly expressed his desire to ensure that Michael would receive his entitlements and asked him to schedule appointments with third parties to help ensure that this happened, which Marger promptly blocked.

81.    Marger took no active role in Sidney's care and seldom visited him while he was at the Jewish Home, but instead used this time to transfer funds for her and her daughter's benefit, to block any memorialization of the promised transfers to Rothberg and to manipulate those who had some capacity to assist her in her efforts to transfer, conceal and misappropriate Sidney's assets.

82.    During Sidney's time at the Jewish Home, Marger continued to take control of Sidney's assets, eventually taking more than $2,500,000 of Sidney's money to purchase an expensive estate at 6 Sisson Terrace, in Tenafly, New Jersey (the "Tenafly Property"), without Sidney's knowledge or agreement, though in Sidney's name.

83.    Also during this time of Sidney's infirmity, Marger transferred more than $700,000 into accounts for her daughter, Lauriel, without Sidney's knowledge or agreement.

84.    Marger also had $575,826.10 transferred to Lauriel, without Sidney's knowledge or agreement.

85.    In early 2008 Sidney offered to purchase and fully maintain a home for Plaintiffs and proceeded to issue checks and electronic transfers for purposes of funding that acquisition.

86.    Sidney Rothberg conferred with Plaintiffs while they searched for a home and the Plaintiffs finally selected 268 Myrtle Avenue, Woodbine, NJ 08270 ("Premises").

87.    The original closing was scheduled for April 25, 2008 but did not occur because the seller needed more time to move from the Premises and was eventually rescheduled for May 30, 2008.

88.    Also in early 2008, Marger approached Rothberg and asked him to help her get Sidney declared incompetent so that she could assume complete control of all Sidney's interests.

89.     Rothberg refused Marger's request saying that he could not do that to Sidney and that Sidney should have control over his assets.

90.     In April 2008, after months of positive progress in Sidney's condition under Plaintiffs' care, Marger informed Rothberg that Sidney would not be allowed to use his money any longer and would not be allowed to continue the Trading that he so enjoyed.

91.     As a result of her depriving Sidney of his ability to engage in Trading which, with Plaintiffs' assistance, he was doing well and making money, Sidney became depressed.

92.     Meanwhile Marger, who turned around and tried to sell shares Sidney and Rothberg had purchased in a fashion contrary to the plan Rothberg and Sidney had been following, lost millions for Sidney and the Estate because she sold too early when, as Sidney and Rothberg had anticipated, the price went up 20 to 200 percent what she had prematurely sold the stock for.

93.     On or about April 21, 2008 for unknown reasons, Sidney was placed on morphine twice each day, but often refused to take it.

94.     On May 8, 2008, over the objections of his physician, Dr. Mary Ann Forcia, Marger had Sidney moved to the Tenafly Property, on which Marger had not yet closed, but for which she had obtained and executed a use and occupancy agreement with the intention to later purchase using $2.5 million of Sidney's money, all in Sidney's name, but against Sidney's wishes.

95.     The morning of the day Sidney was forced by Marger to move from the Jewish Home to the Tenafly Property, Plaintiffs had breakfast with Sidney during which time he was eating and communicative.

96.     Based on information and belief, upon arrival at the Tenafly Property and with no obvious justification, Marger provided Sidney with no food and no water and substantially increased his doses of morphine from 2 times each day to once every three or four hours, giving him morphine each and every time he tried to communicate or seek to eat or drink anything.

15

97.     Four days later, on May 13, 2008, while under Marger's exclusive control Sidney Rothberg died.

98.     Based on information and belief, at the time of Sidney's death, while under Marger's exclusive care, and over the objections of Plaintiffs, Sidney's brother, Gerald Rothberg, and Marger's daughter Lauriel, Marger had Sidney heavily medicated and subjected him to adverse conditions and circumstances including overmedication and malnutrition, concluding with his death.

99.     Sidney's medications while under Marger's exclusive care included, without limitation, Celexa, Zyprexa/Olanzapine, Aricept/Donepezil, Lorazepam, and excessive amounts of pain medications such as Morphine and Fentanyl patch, which are known to have adverse side-effects and which his condition did not warrant.

100.    Subsequent to Sidney's death, Marger took immediate steps to seize, misappropriate and conceal all the assets of the Estate, while regularly consulting with Defendant Markovitz, using as much as 17 days from the date of his death to perform these acts of larceny, during which time she failed to report Sidney's death to anyone.

101.    During this time, Marger asked Rothberg if he knew where Sidney's 1970s Will was located and if he had seen it, to which Rothberg responded that he did not and that he had not seen it.

102.    With the assurance that Rothberg did not have a copy of the 1970s Will, Marger ordered Defendant Ingram to destroy any and all documents located in Sidney's two storage lockers and his two-story condominium in Philadelphia, while, based on information and belief, she took it upon herself to ensure all other documents regarding Sidney's properties, interests, records of art purchases, sales and personal/corporate interests, assets and intentions, including the 1970s Will, were destroyed, so that she could advance only the single page 2002 Will and the as-of-yet unseen power-of-attorney, to show Sidney's intentions and continue her efforts to

16

misappropriate the assets of the Estate, interfere with Rothberg's interest and breach her fiduciary obligations to the creditors, heirs and beneficiaries of the Estate, including Rothberg.

103.    Sidney was survived by his brother, Gerald Rothberg, his sister-in-law, Elaine Rothberg, their children, Rei and Roshanna and their five grand-children.  Sidney was also survived by Rothberg and Marger, together with Marger's daughter, Lauriel.

104.    In addition, there is a contested claim by Lynn Rothberg Kearney, wherein she asserts an interest in the Estate as Sidney's oldest daughter.  Based on information and belief, Ms. Kearney has two children, Jeffrey and Andrew Kearny.

105.    In Sidney's 1970s Will, Gerald had been named as Executor and Administrator and it is understood that there were likely small testamentary gifts to his other heirs, with the bulk of the Estate being divided evenly between Rothberg and Marger.  Despite this understanding of Sidney's intentions from the time Marger and Rothberg were teenagers, Marger asserts entitlement to virtually all of the Estate, to the detriment of Rothberg.

106.    Based on information and belief, at a time when Sidney Rothberg, a Wharton School of Business educated collector and world-renowned commodities trader, was under duress, heavily medicated and susceptible to influence, was asked by Marger, to whom he had given limited authority to ensure all his bills were paid, to sign one or two pages with no writing, one of which was witnessed by the doorman for the building where Sidney lived.  Marger then completed the text of those documents and has been using them to try to take virtually all of Sidney's multi-million dollar Estate for herself, cutting her brother, Rothberg out.

107.    Marger has used these forged and fabricated testamentary documents to manipulate the assets of the Estate so that even inter-vivos transfers from Sidney to Rothberg, and distinct corporate interests and commercial paper, have all gone unpaid.

108.    As a result of Sidney's efforts to care for his son, and despite efforts by Marger to thwart Sidney's intentions, towards the end of Sidney's life, Rothberg had the following direct

17

confirmed interests in Estate assets which, due to Marger's seizing control of the Estate, were either illegally converted from his interest to her own or which have otherwise, through Marger's tortious conduct and breach of her fiduciary obligations, gone unpaid: (a) more than $1,000,000.00 in certificates of deposit owned by Sidney and expressly made payable on death to Michael S. Rothberg (the whereabouts of these CDs is unknown, but based on information and belief, Marger converted them for her own use using her disputed authority as administrator, attorney-in-fact, and/or Administratrix of Sidney's Estate); (b) $337,000 in cash funding the "Michael Rothberg Trust," created by Sidney during Sidney's life time; (c) another $337,000 in the "Michael S. Rothberg Trust" funded by a combination of artwork and cash created by Sidney during his lifetime; (d) a 25% interest in a New Jersey Corporation named SMR, Inc. ("SMR") that had been created by Sidney for the purpose of buying and selling artwork and which held, over the years of transactions in artwork, as much as $200,000,000 in artwork, 25% of which was Rothberg's; (e) all men's jewelry contained in the Estate, which had been promised to Rothberg since he was a child, including without limitation, the Diamond Jim Brady Walking Stick, the Louis Vith Rolex Watch, the Piaget watch, the gold Omega watch given to Sidney by Rothberg's mother, Marybeth, which is collectively estimated to be worth in excess of $10,000,000 and (f) one of the two Frank Loyd Wright Dining Room sets owned by Sidney at the time of his death.

109.    In addition to the items referenced in the preceding paragraph, Michael was owed the fulfillment of Sidney's 2007 and 2008 promises for 66th Street and the $5.5 million UBS Account, as well as the $2.5 million in cash.

110.    As the person vested with Sidney's power-of-attorney, as administrator and Administratrix, Marger owed a fiduciary duty to the Estate's heirs, beneficiaries and creditors, including Rothberg, to freeze, maintain, account for, safeguard and then deliver full value for their respective interests in the Estate and its assets.

111.    Marger breached that duty by converting Estate assets for her own benefit and for the benefit of her daughter, Lauriel, failing to properly account for all the Estate's assets, failing to distribute the Estate's assets to its beneficiaries and creditors, including Rothberg, failing to properly account for, liquidate and/or divide and distribute the assets of SMR, blocking the stated intentions of Sidney Rothberg, destroying, or causing to be destroyed, evidence of the Estate's assets and other critically important documents, including without limitation all instruments of obligation known by Rothberg to have once existed.

112.    Thirteen days after Sidney's death, the closing on the Premises was rescheduled.

113.    Upon learning from Rothberg that the closing, which had originally been scheduled for April 24, 2011, had not yet taken place, Marger and Markovitz contacted Rothberg and told Plaintiffs that he could not acquire the Premises directly but had to purchase it through a trust.

114.    Markovitz threatened Rothberg if he did not agree to the trust.

115.    Marger offered significant return consideration in exchange for the creation of the trust and an associated Assignment.

116.    That consideration included, without limitation, the following: (a) fully insuring and maintaining the Premises until it could be torn down and a new high quality residence, all costs and expenses for which would be covered by Marger as Administratrix of the Estate, could be built and occupied by Plaintiffs, and then fully insuring and maintaining that new home, including, without limitation, all maintenance, repairs, insurance, furnishing, appliances and fixtures; (b) an annual allowance for vacations comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (c)  an apartment in New York City at absolutely no cost to Plaintiffs that they could use throughout their lives and that they could then give to their daughter, Tara; (d) $100,000.00 for their daughter Tara's wedding; (e) a $1,000,000.00 trading account for Michael Rothberg to use in his absolute discretion for commodities and stock trading for his exclusive benefit; (f) annual shopping sprees comparable to the ones Sidney Rothberg had given Plaintiffs

19

during his lifetime; (g) new cars for Michael and Theresa (including the services of a driver for Michael when necessary); (h) medical and dental insurance for their lifetimes; and (i) any and all available technology and education for blind persons.

117.   At the time of the closing, Marger, and her collaborating attorney, Alan Markovitz, Esq., created an "Irrevocable Trust" and an Assignment and required Plaintiffs to execute both the Irrevocable Trust and Assignment in return for which Plaintiffs were promised payment of the referenced consideration.

118.   The Irrevocable Trust created fiduciary obligations for Marger, as controlling trustee, to maintain the Premises that to date Marger has failed and/or refused to honor including, without limitation $17,668.33 in 2008, $7,731.39 in 2009, $26,316.86 in 2010 for total expenses through the end of 2010 of $51,716.58, which it was Marger's fiduciary duty to pay using allocated assets of the Estate, as well as expenses of in excess of $10,000 for 2011 which have not yet been compiled and totaled and which are continuing to be incurred.

119.   Furthermore, over $150,000 still needs to be paid to restore the Premises, which is in a dilapidated condition.

120.   At all times relevant hereto, both Marger and Markovitz knew that any trust for the Premises had to be responsible for maintaining the assets of the trust and their failure to do so has placed the trust assets in jeopardy.

121.   As a direct and proximate result of Marger's breach of her fiduciary duties to the Estate, its beneficiaries and creditors, including Plaintiffs, Plaintiffs have been and continue to be damaged.

   **WHEREFORE**, Plaintiffs respectfully request judgment against the Estate of Sidney Rothberg and Saranne Rothberg Marger, jointly and severally, for application of a constructive trust over all Estate assets, appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the funds owed to Rothberg in accordance with

Sidney Rothberg's intentions, for an order awarding Rothberg the amounts owed to him for the CDs, the two trusts, his share of the value of SMR, continuation of the payment of all his expenses in the manner established during Sidney Rothberg's life, as described herein, payment of the $5.5 contained in the UBS account and the $2.5 million in cash, as well as the residence in New York at 66th Street and all its contents (or the value of the contents), all the men's jewelry held by the Estate at the time of Sidney Rothberg's death (or the value thereof), the Frank Lloyd Wright Dining Room Set, together with all additional amounts necessary to bring Rothberg's acquisitions to 50% of the Estate or an additional 50% of the remainder as mandated in the 1970s Will, as well as for any and all past, present and future costs to repair, including without limitation, the more than 210,000 owed by Marger as controlling trustee to restore and maintain the Premises, together with interest, his attorneys' fees and costs of suit, and any and all other relief deemed equitable and just by this Court.

## SECOND COUNT
### (Tortious Interference with Payment of Estate Obligations to Rothberg, Rothberg's Expectation of Payment and Rothberg's Expectation of an Inheritance and/or Gift by Defendants Marger, Ingram, Markovitz, Jones, Wachovia/Wells Fargo, Brandt and North Fork/Capital One)

122.    Rothberg integrates by reference all allegations previously set forth in this Complaint as if fully stated herein.

123.    At all times relevant hereto, Defendant Marger was fully aware of the money, artwork and other assets owed to Plaintiff by the Estate and Defendants Ingram, Markovitz, Jones, Wachovia/Wells Fargo, Brandt and North Fork/Capital One were aware of some of the assets of the Estate to which Rothberg was entitled.

124.    At all times relevant hereto, all Defendants knew, or should have known, that Marger did not have the authority over the Estate that she represented herself to have.

125.     The Defendants nevertheless tortiously interfered with the payment of the Estate's obligations to Rothberg, tortiously interfered with Rothberg's expectation of payment from the Estate and tortiously interfered with Rothberg's economic interests.

126.     Defendants' tortious interference took the form of, among other things, interfering with Rothberg's relationship with Sidney Rothberg, blocking Sidney's intentions to ensure that his intentions were fulfilled, converting Estate assets in which Rothberg had an interest to their benefit, failing to properly account for all the Estate's assets in which Rothberg had an interest, failing to distribute the Estate's assets to its true heirs, beneficiaries and creditors, including Rothberg, failing to accurately and properly account for, liquidate and/or divide and distribute the assets of SMR, spending Estate assets without regard to Rothberg's interest in them, destroying, or causing to be destroyed, evidence of the Estate's assets and other critically important documents, including without limitation Comex records from the 1970s and 80s, tax returns, the 1970s Will, records of art purchases, sales and personal/corporate interests, and all other instruments of obligation known by Rothberg to have once existed, moving and concealing substantial Estate assets (in particular moving millions of dollars of artwork, statuary, jewelry, gold, silver, rare books and other collectables from New York City to New Jersey and other places, replacing legal instruments of obligation, such as the $1,000,000 in certificates of deposit made POD to Michael Rothberg, with contrary instruments in an effort to fraudulently delete Rothberg's interest, transferring funds in Sidney Rothberg's accounts to accounts for Marger and her daughter, Lauriel, and attempting to sell some of those assets without any record, as well as to improperly manufacture Estate documents to give Marger unauthorized indicia of power over the Estate assets for her to try and use to misappropriate those assets.

127.     Up until the time of Sidney Rothberg's death, Sidney supported Rothberg, who was determined legally blind by the age of 18 and whose condition worsened over time to being declared profoundly blind by the age of 40.

22

128.    Sidney Rothberg gave Rothberg regular and substantial gifts and support including, without limitation, between $5000 and $10,000 each month, over $1,000,000.00 in certificates of deposit, referenced in the preceding claim, $350,000 for the purchase of a house in Cape May, New Jersey, the Michael Rothberg Trust in the amount of $337,000 that was supposed to have been funded in cash, and the Michael S. Rothberg Trust, in the amount of $337,000 that was supposed to have been funded in a combination of artwork and cash, which Marger failed to fund, acting against the wishes of Sidney Rothberg, all the men's jewelry held by the Estate, the UBS Account, $2.5 million in cash, one of the two Frank Lloyd Wright dining room sets in the possession of the Estate and 66th Street, as previously referenced, none of which Marger has allowed to be paid out to Rothberg, with the exception of a brief continuation of the monthly support payments, which she discontinued when Rothberg objected to the things Marger was doing with the Estate.

129.    Sidney Rothberg also assured Rothberg that Rothberg would be taken care of after he, Sidney, died, which Marger started to do but then ceased when Rothberg expressed disagreement with the way in which Marger was handling the Estate.

130.    Prior to Sidney Rothberg's death in May 2008 and prior to Marger's relocating Sidney from the Jewish Home in Rockleigh, NJ to the Tenafly Property, Plaintiffs were working with Sidney and taking care of him 12 hours each day.

131.    While caring for his father, Michael was made aware of more than $17 million in certificates of deposit, money market funds, stocks, preferred stocks, bonds (federal, municipal and corporate) and cash that Sidney had been using for investment purposes and which Rothberg was asked by his father to help his father manage.

132.    Prior to Marger's moving Sidney to the Tenafly Property, Sidney expressly requested that 2.5 million dollars in cash and the UBS Account, out of the $17 million referenced

in the preceding paragraph, be turned over to Rothberg. To this day, Marger continues to refuse to honor Sidney's intentions.

133.    During this time when Rothberg was caring for his father more than 12 hours each day, he learned of millions of dollars that Marger had, through use of a limited power of attorney allegedly granted to her by her father for the very limited purpose of paying his bills, been moving into hers and her daughter's names, with the knowledge and cooperation of Jones, Wachovia/Wells Fargo, Brandt and North Fork/Capital One. When Sidney learned of this from Michael, Sidney was outraged, explaining that he had only given Marger a limited power of attorney ("POA") account that was to contain no more than $100,000 at any one time, to pay daily costs and expenses. Sidney then made efforts to have that money properly reallocated, which efforts Marger was partially successful in blocking using her established relationship with the various financial institutions including, without limitation, Wachovia/Wells Fargo and North Fork/Capital One, where some assets resided.

134.    Defendants Brandt, Jones, Wachovia/Wells Fargo, North Fork/Capital One were all complicit in and facilitated Marger's misappropriation of Sidney's assets, themselves tortiously interfering with Rothberg's entitlements.

135.    In 2008 Sidney regularly expressed his desire and intentions to ensure that his entire Estate was divided equally between Rothberg and Marger, as he had originally required in the 1970s Will. Marger, with the cooperation and assistance of the other Defendants, blocked each and every one of those efforts.

136.    At the time of Sidney's death, Rothberg knew that he was entitled to receive: (a) more than $1,000,000.00 in certificates of deposit owned by Sidney and expressly made payable on death to Rothberg (the whereabouts of these CDs is unknown, but based on information and belief, Marger, with the assistance of Defendants Brandt and Jones, converted them for her own use using her disputed authority as administrator, attorney-in-fact, and/or Administratrix of

Sidney's Estate); (b) $337,000 in cash funding the "Michael Rothberg Trust," created by Sidney

during Sidney's life time; (c) another $337,000 in the "Michael S Rothberg Trust" funded by a

combination of artwork and cash; and (d) a 25% interest in the assets of SMR, which was used for

over thirty years as the corporate entity through which Sidney purchased and sold art work

estimated to be worth many millions of dollars.

137.    Rothberg had also been promised the $5.5 million UBS Account shortly before

Sidney's death which was blocked by Marger.

138.    Rothberg had also been promised $2.5 million in cash.

139.    Rothberg had also been promised 66th Street and all its contents.

140.    Rothberg had also been promised that he would continue to receive the care he had

been given during Sidney's lifetime including, without limitation, the annual shopping sprees,

annual vacations, maintenance and insurance for the home that Sidney had purchased for Plaintiffs

and monthly stipends of between $5,000 and $10,000.

141.    Rothberg had also been promised all the men's jewelry in the Estate (an

approximately $10 million value) and one of the two Frank Lloyd Wright dining room sets, which

had been promised throughout Rothberg's life.

142.    For ten years before his death, Sidney made efforts to ensure that Michael was well-

cared for during Sidney's life and after his death, wanting to set up appointments with top

accounting firms to ensure that his wishes were properly carried out and legally enforceable, but at

each point Marger, took steps to block Sidney's objectives, causing the appointments made with

the financial consultants to be cancelled.

143.    Despite Sidney's assurances and Rothberg's reasonable expectations, Rothberg has

received virtually none of the money from the Estate to which he is entitled due to Marger's

tortious conduct, with the assistance of the other Defendants, and is surviving primarily on

assistance others, and as a result of this tortious interference, payment on his personal and home expenses are in arrears.

144. Marger, with the assistance of the other Defendants, has taken numerous steps to interfere with and block Rothberg's entitlements, going so far as to cause a frivolous "verified" complaint to be filed against Rothberg seeking to restrain and enjoin him from "interfering with the administration of the estate," in New Jersey Superior Court, Cape May County, under docket no. CPM-C-80-08. That complaint was ultimately withdrawn, but is further demonstrative evidence of Marger's tortious interference with Rothberg's entitlements.

145. Defendant Marger, with the assistance and cooperation of the other Defendants, has intentionally and tortiously interfered with and prevented Rothberg from securing the Estate assets to which he is entitled, converting the assets to her own use.

146. As a direct and proximate result of Marger's interference, Rothberg has been damaged.

**WHEREFORE,** Plaintiff Michael S. Rothberg respectfully requests judgment against the Defendants, jointly and severally, for application of a constructive trust over all Estate assets, appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the funds owed to Rothberg, for an order awarding Rothberg the amounts owed to him for the CDs, the two trusts, his share of the value of SMR, continuation of the payment of all his expenses in the manner established during Sidney Rothberg's life, as described herein, payment of the $5.5 contained in the UBS account and the $2.5 million in cash, as well as the residence in New York at 66th Street and all its contents (or the value of the contents), all the men's jewelry held by the Estate at the time of Sidney Rothberg's death (or the value thereof), and the Frank Lloyd Wright Dining Room Set, together with all additional amounts necessary to bring Rothberg's acquisitions to 50% of the Estate, or an additional 50% of

the remainder as mandated in the 1970s Will, together with interest, his attorneys' fees and costs of suit, and any and all other relief deemed equitable and just by this Court.

## THIRD COUNT
### (Breach of Assignment and Trust Agreements against Marger)

147.   Plaintiffs integrate by reference all allegations previously set forth in this Complaint as if fully stated herein.

148.   In early 2008, Sidney Rothberg agreed to purchase and fully maintain a home for Plaintiffs.

149.   Sidney Rothberg wrote two checks in the amount of $10,000 to the realtor for the deposit and authorized two electronic transfers, totaling $340,000, to the attorney trust account of the closing attorney, Dorothy McCrosson, for purposes of funding that purchase.

150.   Sidney Rothberg conferred with Plaintiffs while they searched for a home and the Plaintiffs finally selected 268 Myrtle Avenue, Woodbine, NJ 08270 ("Premises").

151.   The original closing was scheduled for April 25, 2008 but did not occur because the seller needed more time to move from the Premises and was eventually rescheduled for May 30, 2008.

152.   Sidney Rothberg died 17 days prior to the closing taking place for the purchase of the Premises, but 34 days after the money for the purchase had been deposited in the realtor's and closing attorney's accounts.

153.   At all times relevant hereto, Marger was fully aware of Sidney Rothberg's intention to purchase and fully maintain a home for Plaintiffs, fully understanding that their disabilities would not allow them to maintain the Premises without continued support from Sidney and then his Estate.

154.   At the time of the closing, Marger, and her collaborating attorney, Alan Markovitz, Esq., required Plaintiffs to execute the Assignment of their interests in the Premises and a trust

agreement that created a trust that would own the Premises, and which Marger and her teenaged daughter, Lauriel, would control.

155.    The Assignment expressly stated that Plaintiffs were to be provided return good and valuable consideration, but the consideration was not expressly stated.

156.    The consideration that Marger had promised Plaintiffs in exchange for their signatures on the trust and the Assignment included, without limitation:  (a) fully insuring and maintaining the Premises until it could be torn down and a new high quality residence, all costs and expenses for which would be covered by Marger as Administratrix of the Estate, could be built and occupied by Plaintiffs, and then fully insuring and maintaining that new home, including, without limitation, all maintenance, repairs, insurance, furnishing, appliances and fixtures; (b) an annual allowance for vacations comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (c)  an apartment in New York City at absolutely no cost to Plaintiffs that they could use throughout their lives and that they could then, in time, give to their daughter, Tara; (d) $100,000.00 for their daughter Tara's wedding; (e) a $1,000,000.00 trading account for Michael Rothberg to use in his absolute discretion for commodities and stock trading for his exclusive benefit; (f) annual shopping sprees comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (g) new cars for Michael and Theresa (including the services of a driver for Michael when necessary); (h) medical and dental insurance for their lifetimes; and (i) all available technologies and education available for the blind for Rothberg.

157.    At the time of these promises, Marger presented the appearance of authority to bind both her and the Estate to payment of this promised consideration.

158.    At the time of the closing, Marger told Plaintiffs that, as Sidney Rothberg's son, Rothberg "was worth millions and so could have all of these things and more" and that she would ensure that Plaintiffs would get all these things in exchange for their executing the Assignment and allowing the trust to be created, suggesting at the time, that it was necessary for some Estate

administration purposes including, without limitation, to protect against claims by other interested parties including their eldest sister, Lynn Rothberg Kearney.

159.    Despite Marger's proclamation, and despite the promises of consideration, which while clearly articulated to Plaintiffs, were only ambiguously and generally referenced in the Assignment (which was prepared by Marger without Plaintiffs having had any opportunity to review prior to be compelled to sign at the closing for the Premises and without Rothberg, who is blind, being fully apprised of the trust and Assignment's provisions), Plaintiffs have received none of the promised consideration.

160.    Because Marger and Defendant Markovitz created the Assignment without Plaintiffs having participated in its creation, and based on Marger and Markovitz' failure to expressly state the consideration being paid for the Assignment and for the trust, they must be construed against Marger with Plaintiffs' understanding of the consideration being enforced.

161.    Marger is now in breach of the promises and agreements contained in the trust agreement and the Assignment, with all ambiguities being resolved in Plaintiffs' favor.

162.    As a direct and proximate result of Marger's breach of the Assignment, Plaintiffs have been damaged.

**WHEREFORE**, Michael S. Rothberg and Theresa Rothberg respectfully request judgment against the Estate of Sidney Rothberg and Saranne Rothberg Marger, jointly and severally, for: (a) fully insuring and maintaining the Premises until it could be torn down and a new high quality residence, all costs and expenses for which would be covered by Marger as Administratrix of the Estate, could be built and occupied by Plaintiffs, and then fully insuring and maintaining that new home, including, without limitation, all maintenance, repairs, insurance, furnishing, appliances and fixtures; (b) an annual allowance for vacations comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (c) an apartment in New York City at absolutely no cost to Plaintiffs that they could use throughout their lives and that

29

they could then give to their daughter, Tara; (d) $100,000.00 for their daughter Tara's wedding; (e) a $1,000,000.00 trading account for Michael Rothberg to use in his absolute discretion for commodities and stock trading for his exclusive benefit; (f) annual shopping sprees comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (g) new cars for Michael and Theresa (including the services of a driver for Michael when necessary); (h) medical and dental insurance for their lifetimes; and (i) any and all available technology and education for blind persons; as well as for application of a constructive trust over all Estate assets, appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the consideration owed to Plaintiffs, for an order awarding Plaintiffs the amounts owed to them in consideration for the Assignment and trust agreements, together with interest, attorneys' fees and costs of suit, and any and all other relief deemed equitable and just by this Court.

## FOURTH COUNT
### (Fraud and Fraudulent Inducement by Plaintiffs against Marger and Markovitz)

163.     Rothberg integrates by reference all allegations previously set forth in this Complaint as if fully stated herein.

164.     At all times relevant hereto, Defendant Marger was fully aware of the money, artwork, jewelry, furniture, trusts and other assets owed to Plaintiffs by herself and the Estate.

165.     As a result of their creation of the Irrevocable Trust and Assignment Marger and Markovitz were aware of the consideration owed to Plaintiffs thereunder.

166.     Despite her knowledge of the truth, and with the clear intention to deceive, Defendant Marger misappropriated for her own use and benefit and for the use and benefit of her daughter, Lauriel, assets of the Estate owed to or otherwise intended for Rothberg.

167.   Despite their knowledge of the truth, and with the clear intention to deceive, Defendants Marger and Markovitz defrauded Plaintiffs, inducing them to execute their Assignment and Irrevocable Trust at the time of the closing on the Premises.

168.   The consideration promised to Plaintiffs was material to their agreeing to the Assignment and Irrevocable Trust.

169.   Marger's and Markovitz' fraudulent conduct includes, without limitation, lying to third parties in an effort to isolate Sidney from others, including Plaintiffs and Lynn Rothberg Kearney, using limited authority over the disposition of Estate assets in which the Rothbergs had an interest, to convert them for her own benefit, fraudulently failing to properly account for all the Estate's assets in which Rothberg had an interest, failing to distribute the Estate's assets to its beneficiaries and creditors, including Plaintiffs, failing to properly account for, liquidate and/or divide and distribute the assets of SMR, fraudulently destroying, or causing to be destroyed, evidence of the Estate's assets and other critically important documents, including without limitation all instruments of obligation known by Plaintiffs to exist, fraudulently moving and concealing substantial Estate assets (in particular moving millions of dollars of artwork, jewelry, statuary, rare books, gold, silver, furniture and other valuable items) from New York City to New Jersey and other places, fraudulently inducing Plaintiffs to act in ways that would benefit Marger but defeat Plaintiffs' interests (e.g. the Irrevocable Trust and Assignment for the closing on the Premises),  attempting to sell Estate assets without any record, as well as to fraudulently manufacture Estate documents to give Marger unauthorized power over the Estate assets and to destroy all documents which would have undermined her authority.

170.   Particular examples of Marger's fraud include the following: (a) using her power as purported attorney-in-fact (which was supposed to have been severely limited) to change over $1,000,000 in certificates of deposit that were expressly made payable to Rothberg, to make them payable to Marger, either directly or through her position as attorney-in-fact for Sidney Rothberg;

(b) countermanding Sidney Rothberg's choices and replacing them with her own (including without limitation her decision to cancel the appointments with three of the top five accounting firms in 2008 when Sidney Rothberg wanted to retain their services to do financial planning for the benefit of both Rothberg and Marger); (c) blocking Sidney Rothberg's desire to ensure that his entire Estate was evenly distributed between Rothberg and Marger; (d) fraudulently destroying, causing to be destroyed, or otherwise concealing all objective indicia of Sidney Rothberg's real intent with respect to his heirs (e.g. destroying the 1970s Will prepared by his attorneys and replacing them with the one-page 2002 Will); (e) filing testamentary documents misrepresenting the assets of the Estate, the will of Sidney Rothberg and his domicile in order to defeat the interests of Sidney's heirs, including Michael S. Rothberg; (f) misrepresenting what Marger would provide to Plaintiffs in exchange for their agreements with respect to the Assignment and the Irrevocable Trust on the Premises; (g) concealing and converting the assets of the Estate in which Rothberg has an established interest (e.g. the SMR assets in which Rothberg held a 25% interest), knowing that they belonged to Rothberg; (h) concealing and then trying to liquidate certain assets of the Estate to avoid her obligation to pay Plaintiffs what they are owed; (i) writing checks, transferring funds and spending Sidney Rothberg's money without authority (including without limitation, transferring more than $700,000 into an account for her daughter, Lauriel, and transferring $2,500,000 to accounts for the purchase of the Tenafly Property, against Sidney's will and authority); (j) fraudulently executing, or causing to be created, a signature card for Michael at Wachovia and, based on information and belief, other financial institutions and businesses; (k) fraudulently misrepresenting facts regarding Sidney Rothberg and the Estate in her May 30, 2008 filings with the Philadelphia Court of Common Pleas, Orphans Court Division, in an effort to deprive Plaintiffs of assets of the Estate to which they are entitled; (l) falsifying inventory records for assets of the Estate; and (m) failing to report Sidney's death for 17 days during which time she seized, liquidated and transferred assets of the Estate for her benefit.

32

171.   As a direct and proximate result of Marger's and Markovitz' fraud, Plaintiffs have been damaged.

172.   As a direct and proximate result of Marger's fraud, Rothberg is entitled to the amounts owed to him for the CDs, the two trusts, his share of the value of SMR, continuation of the payment of all his expenses in the manner established during Sidney Rothberg's life, as described herein, payment of the $5.5 contained in the UBS account and the $2.5 million in cash, as well as the residence in New York at 66th Street and all its contents (or the value of the contents), all the men's jewelry held by the Estate at the time of Sidney Rothberg's death (or the value thereof), and the Frank Lloyd Wright Dining Room Set, together with all additional amounts necessary to bring Rothberg's acquisitions to 50% of the Estate as mandated in the 1970s Will, together with interest, his attorneys' fees and costs of suit, while Plaintiffs are entitled to: (a) fully insuring and maintaining the Premises until it could be torn down and a new high quality residence, all costs and expenses for which would be covered by Marger as Administratrix of the Estate, could be built and occupied by Plaintiffs, and then fully insuring and maintaining that new home, including, without limitation, all maintenance, repairs, insurance, furnishing, appliances and fixtures; (b) an annual allowance for vacations comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (c) an apartment in New York City at absolutely no cost to Plaintiffs that they could use throughout their lives and that they could then give to their daughter, Tara; (d) $100,000.00 for their daughter Tara's wedding; (e) a $1,000,000.00 trading account for Michael Rothberg to use in his absolute discretion for commodities and stock trading for his exclusive benefit; (f) annual shopping sprees comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (g) new cars for Michael and Theresa (including the services of a driver for Michael when necessary); (h) medical and dental insurance for their lifetimes; and (i) any and all available technology and education for blind persons; as well as for appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the

consideration owed to Plaintiffs, for an order awarding Plaintiffs the amounts owed to them in consideration for the Assignment and trust agreements, together with interest, attorneys' fees and costs of suit.

**WHEREFORE**, Plaintiff Michael S. Rothberg respectfully request judgment against the Estate of Sidney Rothberg, Saranne Rothberg Marger and Alan F. Markovitz, jointly and severally, for application of a constructive trust over all Estate assets, appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the funds owed to Rothberg, for an order awarding Rothberg the amounts owed to him for the CDs, the two trusts, his share of the value of SMR, continuation of the payment of all his expenses in the manner established during Sidney Rothberg's life, as described herein, payment of the $5.5 contained in the UBS account and the $2.5 million in cash, as well as the residence in New York at 66th Street and all its contents (or the value of the contents), all the men's jewelry held by the Estate at the time of Sidney Rothberg's death (or the value thereof), and the Frank Lloyd Wright Dining Room Set, together with all additional amounts necessary to bring Rothberg's acquisitions to 50% of the Estate, or an additional 50% of the remainder, as mandated in the 1970s Will, together with interest, his attorneys' fees and costs of suit, and any and all other relief deemed equitable and just by this Court; and

Plaintiffs respectfully request judgment against the Estate of Sidney Rothberg, Saranne Rothberg Marger, and Alan F. Markovitz, Esq., jointly and severally, for: (a) fully insuring and maintaining the Premises until it could be torn down and a new high quality residence, all costs and expenses for which would be covered by Marger as Administratrix of the Estate, could be built and occupied by Plaintiffs, and then fully insuring and maintaining that new home, including, without limitation, all maintenance, repairs, insurance, furnishing, appliances and fixtures; (b) an annual allowance for vacations comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (c) an apartment in New York City at absolutely no cost to

Plaintiffs that they could use throughout their lives and that they could then give to their daughter, Tara; (d) $100,000.00 for their daughter Tara's wedding; (e) a $1,000,000.00 trading account for Michael Rothberg to use in his absolute discretion for commodities and stock trading for his exclusive benefit; (f) annual shopping sprees comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (g) new cars for Michael and Theresa (including the services of a driver for Michael when necessary); (h) medical and dental insurance for their lifetimes; and (i) any and all available technology and education for blind persons; as well as for appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the consideration owed to Plaintiffs, for an order awarding Plaintiffs the amounts owed to them in consideration for the Assignment and trust agreements, together with interest, attorneys' fees and costs of suit, and any and all other relief deemed equitable and just by this Court.

## FIFTH COUNT
### (Violation of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 et seq. ("RICO") Against All Defendants)

173.    Plaintiffs integrate by reference all allegations previously set forth in this Complaint as if fully stated herein.

174.    At all times relevant hereto, Defendant Marger and a group of co-conspirators all of whom are not yet know, but including, without limitation, Alan F. Markovitz, Esq. (one of Marger's attorneys), Nellie Ingram (Sidney's housekeeper for more than 25 years), Mark Jones (a banker with Wachovia), Wachovia Bank, NA, George Brandt (a banker for North Fork Bank and then Capital One Bank), Capital One Bank, Comedy Cures (a closely held charitable organization created by Marger and used here for the purpose of administering and transferring assets of the Estate), Lauriel Marger (Marger's daughter who used and benefitted from the misappropriated Estate assets), John and Jane Does 1 through 20 and ABC Corporations A through Z (collectively referred to as "Marger and her co-conspirators"), were fully aware of the money, artwork and other

assets owed to Plaintiffs by Marger and the Estate, when they worked to divert assets from the Estate and conceal them from the Estate's creditors, heirs and beneficiaries, including Plaintiffs.

175.    Marger and her co-conspirators intentionally misappropriated many millions of dollars of assets belonging to the Estate and then proceeded to conceal them so that heirs, beneficiaries and creditors, including Plaintiffs, would be deprived of money that was owed to them by the Estate.

176.    Marger and her co-conspirators intentionally misappropriated many millions of dollars of assets belonging to the Estate in order avoid paying debts of the Estate including, without limitation, the money owed to Sidney's son, Plaintiff Michael Rothberg.

177.    In their efforts to misappropriate and conceal the many millions of dollars of Estate assets, Marger and her co-conspirators moved such assets including, without limitation, many millions of dollars in artwork from various artists, including many of the impressionists and "old masters," across state lines and out of the country, in order to secure the value of those assets for themselves and avoid paying debts of the Estate including, without limitation, the money owed to Sidney's son, Michael Rothberg.

178.    In their efforts to misappropriate and conceal the many millions of dollars of Estate assets, Marger and her co-conspirators moved such assets including, without limitation, hundreds of porcelains, fine china, terra cotta, rare books, gold and silver figurines, statues, jewelry and rugs, across state lines and out of the country,  in order to secure the value of those assets for themselves and avoid paying debts of the Estate including, without limitation, the money owed to Sidney's son, Plaintiff Michael Rothberg.

179.    In their efforts to misappropriate interests of Plaintiffs, and upon learning that the closing for the Premises that Sidney Rothberg had paid for prior to his death had not yet occurred, Marger and her co-conspirators, and in particular Alan Markovitz, manipulated the closing to their advantage depriving Plaintiffs of their interest in the Premises and then failing to pay them the

consideration they were promised in return for Plaintiffs signatures on the Assignment and the associated trust.

180.    In their efforts to misappropriate interests of Plaintiffs, and upon learning that the closing for the Premises that Sidney Rothberg had paid for prior to his death had not yet occurred, Marger and her co-conspirators, and in particular Alan Markovitz, manipulated the closing to their advantage depriving Plaintiffs of their interest in the Premises and then failed to honor their created fiduciary obligations to maintain the Premises.

181.    In their efforts to misappropriate and conceal the many millions of dollars of Estate assets, Marger and her co-conspirators, and in particular, Nellie Ingram, took steps to destroy most, if not all, of the records associated with Sidney Rothberg's intentions, assets and interests, in order to conceal and secure the value of those assets for themselves and avoid paying debts of the Estate including, without limitation, the money owed to Sidney's son, Plaintiff Michael Rothberg.

182.    In their efforts to conceal, misdirect and create fraudulent accountings for and of the assets of the Estate, Marger and her co-conspirators failed to pay the proper amount of tax, including without limitation the sales taxes owed on the purchase and sale of the millions of dollars in artwork, on the Estate and Estate assets, jeopardizing the assets of the Estate in which Plaintiffs hold an interest.

183.    Marger and her co-conspirators formed an enterprise in accordance with RICO, which defines an enterprise as including "any union or group of individuals associated in fact although not a legal entity."

184.    Marger and her co-conspirators also used Marger's charity, Comedy Cures, to hide assets of the Estate and deprive the Estate's heirs, beneficiaries and creditors of their entitlements.

185.    Marger and her co-conspirators engaged in a pattern of activity within the meaning of the RICO statute by virtue of their regular and continued activity to deprive the Estate of its

assets, deprive the rightful heirs, creditors and beneficiaries of the Estate, including Plaintiffs, from their entitlements, conceal their actions and convert those assets for their benefit.

186.    In their efforts to transport, control, conceal, hide, misdirect and fraudulently account for the assets of the Estate, and in their effort to deprive creditors and heirs from their interests in the assets of the Estate, Marger and her co-conspirators including, without limitation, Ingram and Markovitz, committed acts of racketeering within the meaning of 18 U.S.C. § 1961.

187.    The acts of racketeering included violations of section 659 (relating to theft from interstate shipment); section 1341 (relating to mail fraud), section 1344 (relating to financial institution fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of state or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1957 (relating to interstate transportation of stolen property), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), as well as fraud in the sale of securities and a violation of the Currency and Foreign Transactions Reporting Act.

188.    Marger and her co-conspirators' violations constitute conduct in advancement of an enterprise through a pattern of racketeering within the meaning of 18 U.S.C. § 1962, proximately resulting in injury to Plaintiffs.

189.    In particular, Marger and her co-conspirators are guilty of violating section 1962(a) through their investment of assets stolen from the Estate and their receipt of income derived from the pattern of racketeering activity designed to take possession of those assets and conceal them from the rightful owners.

190.    Marger and her co-conspirators' violations of law proximately caused Plaintiffs' injuries including, without limitation, their inability to access or account for the assets of the Estate belonging to them.

191.    Marger and her co-conspirators are also guilty of violating section 1962(b) as a result of their acquisition and control over the Estate and the Enterprise to rob the Estate of all its assets without regard to the heirs, beneficiaries and creditors of the Estate, through this established pattern of racketeering activity.

192.    Marger and her co-conspirators' violations of law proximately caused Plaintiffs' injuries including, without limitation, their inability to access or account for the assets of the Estate belonging to them.

193.    Marger and her co-conspirators are also guilty of violating section 1962(c) by virtue of their conduct and participation, both directly and indirectly, in the conduct of the established enterprise through a pattern of racketeering activity by and through their efforts to take assets of the Estate, conceal those assets and otherwise deprive the rightful owners of those assets from their entitlements.

194.    Marger and her co-conspirators' predicate acts included, without limitation, using falsified authority over the disposition of Estate assets in which the Rothbergs had an interest, to convert them for their own benefit, fraudulently failing to properly account for all the Estate's assets in which Rothberg had an interest, failing to distribute the Estate's assets to its beneficiaries and creditors, including the Rothbergs, failing to properly account for, liquidate and/or divide and distribute the assets of SMR which belonged to Rothberg, fraudulently destroying, or causing to be destroyed, evidence of the Estate's assets and other critically important documents, including without limitation all instruments of obligation known by Rothberg to have existed (including without limitation, the 1970s Will, the only true final will and testament of Sidney Rothberg), fraudulently moving and concealing substantial Estate assets (in particular moving millions of dollars of artwork, jewelry, statuary, porcelain, gold and silver, from New York City to New Jersey and other places) and attempting to sell some of those assets without any record, as well as to fraudulently manufacture and transmit fabricated Estate documents to give her unauthorized

39

power over the Estate assets and to destroy all documents which would have undermined Marger's purported authority and to fraudulently use and misrepresent the limited power she had allegedly been given (which had been refused and rejected by some financial institutions, including Republic First located at 1601 Market Street, Phila., PA 19103) to transfer, use and misappropriate Estate assets significantly beyond the scope of her limited power.

195.   Other examples of Marger and her co-conspirators' violations and predicate acts include the following: (a) using her power of attorney (which is unproven and which was at most supposed to have been severely limited to simply paying Sidney's bills) to change over $1,000,000 in certificates of deposit that were expressly made payable to Rothberg, to make them payable to Marger, either directly or through her purported position as attorney-in-fact for Sidney Rothberg; (b) countermanding Sidney Rothberg's choices and replacing them with her own (including without limitation her decision to cancel the appointments with three of the top five accounting firms in the 2008 time frame when Sidney Rothberg wanted to retain the services of these experts to do financial planning for the benefit of both Rothberg and Marger and ensure that his Estate was evenly distributed between them); (c) fraudulently destroying, causing to be destroyed, or otherwise concealing all objective indicia of Sidney Rothberg's real intent with respect to his heirs (e.g. destroying the 1970s Will prepared by his attorneys and replacing it with a one-page inadequately and improperly witnessed and notarized alleged holographic will); (d) filing testamentary documents misrepresenting the assets of the Estate, the will of Sidney Rothberg and his domicile in order to defeat the interests of Sidney's heirs and creditors of the Estate, including Michael S. Rothberg; (f) misrepresenting what Marger would provide to Plaintiffs in exchange for their agreements with respect to the Assignment and the Irrevocable Trust; (g) concealing and converting the assets of the Estate in which Rothberg has an established interest (e.g. the SMR assets in which Rothberg held a 25% interest), knowing that they belonged to Rothberg; (h) concealing and then trying to liquidate certain assets of the Estate to avoid her obligation to pay

40

Plaintiffs what they are owed;  (i) writing checks, transferring funds and spending Sidney

Rothberg's money without authority (including without limitation, transferring more than

$700,000 into an account for her daughter, Lauriel, and transferring $2,500,000 for the purchase of

the Tenafly Property, against Sidney's will and authority); (j) fraudulently executing, or causing to

be created, a signature card for Michael at Wachovia and, based on information and belief, other

financial institutions and businesses; (k) fraudulently misrepresenting facts regarding Sidney

Rothberg and the Estate in her May 30, 2008 filings with the Philadelphia Court of Common Pleas,

Orphans Court Division, in an effort to deprive Plaintiffs of assets of the Estate to which they are

entitled; (l) falsifying inventory records for assets of the Estate; and (m) failing to report Sidney's

death for 17 days during which time she seized, liquidated and transferred assets of the Estate for

her and her co-conspirators' benefit.

196.    As a direct and proximate result of Marger's and her con-conspirators' and the

Enterprise's federal, "Pattern of racketeering activity," including the following:

> a.  Destroying documents that accurately reflected the assets of the Estate and the
>     will of the testator (e.g. the 1970s Will, all tax returns, all registration,
>     licensing and other documents reflecting Sidney Rothberg's domicile, sales
>     and purchasing records for Sidney Rothberg's significant collection of art,
>     statuary, jewelry, silver, gold, porcelain and other valuables);
>
> b.  Fraudulently creating documents to advance their cause of isolating creditors
>     and heirs of Sidney Rothberg's fortune so that the conspirators could
>     misappropriate and convert those assets for their own use and purposes, and
>     forwarding those false documents through the mail and through wire
>     transmissions;
>
> c.  Moving millions of dollars in assets of the Estate from their location in New
>     York and Philadelphia to New Jersey and other places in order to conceal
>     them and prevent creditors and heirs, including the Plaintiffs, from securing
>     their interest in them, through misuse and fraudulent use of limited authority
>     over the Estate assets;
>
> d.  Moving millions of dollars in assets of the Estate from their location in New
>     York and Philadelphia to New Jersey and other places in order to
>     misappropriate and convert them for their own benefit;

e. Misrepresenting facts regarding the Estate to courts and government authorities to hide their efforts to misappropriate and convert the assets of the Estate to their own use and benefit;

f. Taking assets of the Estate for their own use and benefit without consideration for the beneficiaries, heirs and creditors who were rightfully entitled to those assets through misuse and fraudulent use of limited authority over the Estate assets;

g. Moving cash from Sidney Rothberg's accounts to unknown accounts outside of his influence without authorization or knowledge of Sidney, the Estate or its creditors and heirs, through misuse and fraudulent use of limited authority over the Estate assets;

h. Using the assets of the Estate and investing those assets for their own use and benefit;

i. Moving the ill-gotten cash and property of the Estate to vendors in the United States and abroad for purposes of converting them to cash without records or a proper accounting and thus depriving the heirs and creditors of the Estate from the shares of that property to which they are entitled;

j. Seizing assets of the Estate without first properly accounting for them, and then moving them with the purpose of selling or otherwise converting them for their own benefit and depriving the rightful heirs and creditors from their entitlement;

k. Converting and selling assets of the Estate, including cash, art work, securities, bonds and certificates of deposit, without authority and then taking the proceeds for their benefit;

l. Falsifying documents to conceal Estate assets and documents;

m. Retaining and converting money and property that had been given to Plaintiffs; and

n. Destroying Estate records to further conceal their activities and prevent the rightful heirs, creditors and beneficiaries from securing their entitlements,

Plaintiffs have been damaged.

**WHEREFORE,** Plaintiffs respectfully request judgment against the Defendants, jointly and severally, for application of a constructive trust over all Estate assets, appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the funds owed to Plaintiffs, for an order awarding Rothberg the amounts owed to him for the CDs, the two trusts, his share of the value of SMR, continuation of the payment of all his expenses in

the manner established during Sidney Rothberg's life, as described herein, payment of the $5.5 contained in the UBS account and the $2.5 million in cash, as well as the residence in New York at 66th Street and all its contents (or the value of the contents), all the men's jewelry held by the Estate at the time of Sidney Rothberg's death (or the value thereof), and the Frank Lloyd Wright Dining Room Set, together with all additional amounts necessary to bring Rothberg's acquisitions to 50% of the Estate or an additional 50% of the remainder as mandated in the 1970s Will, together with interest, his attorneys' fees and costs of suit, and any and all other relief deemed equitable and just by this Court and allowable under RICO; and

Plaintiffs respectfully request judgment against the Defendants, jointly and severally, for: (a) fully insuring and maintaining the Premises until it could be torn down and a new high quality residence, all costs and expenses for which would be covered by Marger as Administratrix of the Estate, could be built and occupied by Plaintiffs, and then fully insuring and maintaining that new home, including, without limitation, all maintenance, repairs, insurance, furnishing, appliances and fixtures; (b) an annual allowance for vacations comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (c) an apartment in New York City at absolutely no cost to Plaintiffs that they could use throughout their lives and that they could then give to their daughter, Tara; (d) $100,000.00 for their daughter Tara's wedding; (e) a $1,000,000.00 trading account for Michael Rothberg to use in his absolute discretion for commodities and stock trading for his exclusive benefit; (f) annual shopping sprees comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (g) new cars for Michael and Theresa (including the services of a driver for Michael when necessary); (h) medical and dental insurance for their lifetimes; and (i) any and all available technology and education for blind persons; as well as for appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the consideration owed to Plaintiffs, for an order awarding Plaintiffs the amounts owed to them in consideration for the Assignment and trust

agreements, together with interest, attorneys' fees and costs of suit, and any and all other relief deemed equitable and just by this Court and the relief specified by statute.

## SIXTH COUNT
### (Violations of State Civil RICO against All Defendants)

197.    Plaintiffs integrate by reference all allegations previously set forth in this Complaint as if fully stated herein.

198.    Marger is an individual with a residence in New York, representing herself to be the rightful heir of the majority of the Estate and the Administratrix of that Estate.

199.    Marger for herself and as agent of the Estate engaged in trade and commerce, as specified in N.J.S.A. § 2C:41-1.h, in collecting, moving, marketing and selling the assets of the Estate, including many millions of dollars in artwork from, among others, certain impressionists "old masters," and, based on information and belief, continues to do so to this day.

200.    Marger, through her handling of the significant assets of the Estate, in and by herself, is an "enterprise" as defined in N.J.S.A. § 2C:41-1.c.  In addition, Marger, in concert with Alan Markovitz, Esq., Nellie Ingram (Sidney's housekeeper and then Marger's employee for more than 26 years), Mark Jones (a banker with Wachovia), Wachovia Bank, NA, George Brandt (a banker for North Fork Bank and then Capital One Bank), Comedy Cures (a 501(c)3 tax exempt, non-profit organization created by Marger), Lauriel Marger, John and Jane Does 1 through 20 and ABC Corporations A through Z (collectively referred to as "Marger and her co-conspirators"),, constitute an "Enterprise", as defined in N.J.S.A. § 2C:41-1.c., which, in its conduct relative to the assets of the Estate, was also engaged in trade and commerce.  The Enterprise engaged in organized crime type activities and sought and achieved financial gain and tax evasion through those activities.

201.    Marger represented herself to have exclusive control over the assets of the Estate, as well as Comedy Cures, the infrastructure and employees for which she used to carry out the

predicate acts for the Enterprise, when she: (a) used her unproven power of attorney (which was supposed to have been severely limited) to change over $1,000,000 in certificates of deposit that were expressly made payable to Rothberg, to make them payable to Marger, either directly or through her position as alleged attorney-in-fact for Sidney Rothberg; (b) countermanded Sidney Rothberg's choices and replaced them with her own (including without limitation her decision to cancel the appointments with three of the top five accounting firms in the 2008 time frame which Sidney Rothberg wanted scheduled for the purpose of obtaining experts to help him administer his assets for the benefit of both Rothberg and Marger and to block Sidney Rothberg from effectuating his desire to ensure that his Estate was evenly distributed between Rothberg and Marger); (c) fraudulently destroyed, and/or caused to be destroyed, or otherwise concealed all objective indicia of Sidney Rothberg's real intent with respect to his heirs (e.g. destroying the 1970s Will prepared by his attorneys and replacing that with a one-page inadequately and improperly witnessed and notarized alleged will); (d) filed testamentary documents misrepresenting the assets of the Estate, the will of Sidney Rothberg and his domicile in order to defeat the interests of Sidney's heirs, including Michael S. Rothberg; (f) misrepresented what Marger would provide to Plaintiffs in exchange for their agreements with respect to the Assignment and the Irrevocable Trust; (g) concealed and converted the assets of the Estate in which Rothberg has an established interest (e.g. the SMR assets in which Rothberg held a 25% interest and the certificates of deposit in Rothberg's name), knowing that they belonged to Rothberg; (h) concealed and then tried to liquidate assets of the Estate to avoid her obligation to pay Plaintiffs, among others, what they are owed; (i) wrote checks, transferring funds and spending Sidney Rothberg's money without authority (including without limitation, transferring more than $700,000 into an account for Marger's daughter, Lauriel, against Sidney's wishes); (j) fraudulently executing, or causing to be created, signature cards for Michael at Wachovia and, based on information and belief, other financial institutions and businesses; (k) fraudulently misrepresenting facts regarding Sidney Rothberg and the Estate in her

May 30, 2008 filings with the Philadelphia Court of Common Pleas, Orphans Court Division, in an effort to deprive Plaintiffs of assets of the Estate to which they are entitled; (l) falsifying inventory records for assets of the Estate; (m) blocking Sidney Rothberg's efforts to provide for his son and give him specifically designated gifts (e.g. the $5.5 million of the $17 million in available cash and securities that were immediately accessible in the last years of Sidney's life, which Sidney was using for Trading); and (n) to manipulate the real estate assets of the Estate in Atlantic City for her and her co-conspirators' benefit.

202.    Marger is a "Person" as defined in N.J.S.A. §2C:41-1.b.

203.    Nellie Ingram who was employed by Sidney Rothberg, closely held entities of Sidney Rothberg and then Marger for collectively more than 25 years, was directed by Marger to: (a) verify and witness signatures for fraudulent purposes; (b) attest to signatures and documents for the purpose of personal gain, (c) destroy the genuine documents that the fabricated documents were, in some case, designed and intended to replace; (d) destroy documents that reflect the assets of the Estate; and (e) falsify and conceal Marger's manipulations of the Estate's assets for the purpose of concealing her activities and true values, from Sidney Rothberg.

204.    Nellie Ingram is a "Person" as defined in N.J.S.A. § 2C:41-1

205.    Alan Markovitz, at all times relevant hereto represented himself to be acting as an agent of the Estate as well as an attorney for Marger, and at times relevant hereto, an attorney for Rothberg, when he: (a) prepared fraudulent documents on Marger's behalf; (b) prepared and advocated submitting incomplete and inaccurate inventories of the assets of the Estate; (c) prepared documents seizing control of inter-vivos gifts that had been made to Plaintiffs by Sidney prior to Sidney's death; and (d) encouraged and advised Marger to relocate and conceal Estate assets before notifying anyone of Sidney's death and before the filing of the probate in the Court of Common Pleas.

206.    Markovitz is a "Person" as defined in N.J.S.A. §2C:41-1.b.

207.   Mark Jones, at all times relevant hereto represented himself to be acting as an employee, officer and agent of Wachovia Bank, NA and its successor, Wells Fargo Bank, when he: (a) refused to follow the directives of Sidney Rothberg because of contrary orders issued to him by Marger; (b) based on falsified authority and unauthorized orders from Marger, authorized transfers of huge amounts of money belonging to Sidney Rothberg, to Marger and her daughter, Lauriel; and (c) falsified bank documents to carry out Marger's will and in furtherance of the objectives of the Enterprise (e.g. applying false signature cards to the checking, savings and money market accounts for the Michael Rothberg trusts and sending all statements to Comedy Cures).

208.   Jones is a "Person" as defined in N.J.S.A. §2C:41-1.b.

209.   Wachovia Bank, NA and its successor, Wells Fargo, acted in furtherance of the Enterprise and the conspiracy when it, through its officer, agent and employee, Mark Jones: (a) refused to follow the directives of Sidney Rothberg because of contrary orders issued to him by Marger; (b) based on falsified authority and unauthorized orders from Marger, authorized transfers of huge amounts of money belonging to Sidney Rothberg, to Marger and her daughter, Lauriel; and (c) falsified bank documents to carry out Marger's will and in furtherance of the objectives of the Enterprise (e.g. applying false signature cards to the checking, savings and money market accounts for the Michael Rothberg trusts and sending all statements to Comedy Cures).

210.   Wachovia and its successor, Wells Fargo, is a "Person" as defined in N.J.S.A. §2C:41-1.b.

211.   George Brandt, at all times relevant hereto represented himself to be acting as an employee, officer and agent of North Fork Bank, and its successor, Capital One Bank, when he: (a) refused to follow the directives of Sidney Rothberg because of contrary orders issued to him by Marger; (b) based on falsified authority and unauthorized orders from Marger, authorized transfers of huge amounts of money belonging to Sidney Rothberg, to Marger and her daughter, Lauriel;

and (c) falsified bank documents to carry out Marger's will and in furtherance of the objectives of the Enterprise.

212.   Brandt is a "Person" as defined in N.J.S.A. §2C:41-1.b.

213.   North Fork Bank, and its successor, Capital One, through its agent, officer and employee, George Brandt, acted in furtherance of the Enterprise and conspiracy when it: (a) refused to follow the directives of Sidney Rothberg because of contrary orders issued to it by Marger; (b) based on falsified authority and unauthorized orders from Marger, authorized transfers of huge amounts of money belonging to Sidney Rothberg, to Marger and her daughter, Lauriel; and (c) falsified bank documents to carry out Marger's will and in furtherance of the objectives of the Enterprise.

214.   North Fork Bank and Capital One Bank are a "Person" as defined in N.J.S.A. §2C:41-1.b.

215.   Comedy Cures, at all times relevant hereto, was a 501(c)3 tax exempt, non-profit organization created by Marger, which, based on information and belief, Marger used to transport, conceal and liquidate assets of the Estate and which Marger supported using assets of the Estate without Sidney's authorization.  Marger also mingled Estate assets with those of Comedy Cures and used the offices and staff of Comedy Cures for Estate matters, including without limitation, managing, manipulating, concealing and liquidating Estate assets without regard to the interests of the beneficiaries, heirs and creditors of the Estate, including Plaintiffs.

216.   Comedy Cures is a "Person" as defined in N.J.S.A. §2C:41-1.b, and is named as a co-conspirator, but not, given Marger's control of Comedy Cures, and its status as a not-for-profit organization, as a defendant.

217.   Lauriel Marger, daughter of Marger, at all times relevant hereto, was a recipient of the money misappropriated from the Estate by Marger and, based on information and belief, used and continues to use assets of the Estate without regard to the entitlements of heirs, beneficiaries

and creditors of the Estate, thereby facilitating the deceptions, conspiracy, and Enterprise of Marger and her co-conspirators.

218.   Lauriel Marger is a "Person" as defined in N.J.S.A. §2C:41-1.b, and is named as a co-conspirator, but not, given her youth and subjugation by Marger, as a defendant.

219.   John and Jane Does 1 through 20 and ABC Corporations A through Z were individuals and corporations who conspired with Marger to effectuate her will, concealing, moving and converting the assets of the Estate for Marger's and their benefit.  These as of yet unknown people and entities are people within the meaning of N.J.S.A. §2C:41-1.b

220.   Ingram, Markovitz, Jones, Comedy Cures, Brandt, Wells Fargo and Capital One (as well as their predecessors), Lauriel Marger, the John and Jane Does, and the ABC Corporations, in concert with Marger, formed the Enterprise, or jointly comprised the Enterprise, and in that form undertook a course of action that included at least two incidents of "racketeering activity" between 2001 and the date of the filing of this Complaint, as referenced in N.J.S.A. § 2C:41-1.a.(n) ("theft and all crimes defined in chapter 20 of Title 2C of the New Jersey Statutes), and N.J.S.A. § 2C:41-1.a.(o) ("forgery and fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes"), as well as participating in "Prohibited activities" including conspiracy as outlined by N.J.S.A. § 2C:41-2.d.

221.   The "Pattern of racketeering activity" by Ingram, Markovitz, Jones, Comedy Cures, Brandt, Wells Fargo and Capital One (as well as their predecessors), Lauriel Marger, the John and Jane Does, the ABC Corporations, and the Enterprise were interrelated and directed at Plaintiffs, who were victims.

222.   "Pattern of racketeering activity" by the Enterprises and respective Persons included, but was not limited to, the following:

a.   Destroying documents that accurately reflected the assets of the Estate and the will of the testator (e.g. the 1970s Will and testament and other estate documents, all tax returns, all registration, licensing and other documents

49

reflecting Sidney Rothberg's domicile, sales and purchasing records for Sidney Rothberg's significant collection of art, statuary, jewelry, silver, gold, porcelain and other valuables);

b. Fraudulently creating documents to advance their cause of isolating creditors and heirs of Sidney Rothberg's fortune so that the conspirators could misappropriate and convert those assets for their own use and purposes, and forwarding those false documents through the mail and through wire transmissions;

c. Moving millions of dollars in assets of the Estate from their location in New York and Philadelphia to New Jersey and other places in order to conceal them and prevent creditors and heirs, including the Plaintiffs, from securing their interest in them;

d. Moving millions of dollars in assets of the Estate from their location in New York and Philadelphia to New Jersey and other places in order to misappropriate and convert them for their own benefit;

e. Misrepresenting facts regarding the Estate to courts and government authorities to hide their efforts to misappropriate and convert the assets of the Estate to their own use and benefit;

f. Taking assets of the Estate for their own use and benefit without consideration for the beneficiaries, heirs and creditors who were rightfully entitled to those assets;

g. Moving cash from Sidney Rothberg's accounts to unknown accounts outside of his influence without authorization or knowledge of Sidney, the Estate or its creditors and heirs;

h. Using the assets of the Estate and investing those assets for their own use and benefit;

i. Moving the ill-gotten cash and property of the Estate to vendors in the United States and abroad for purposes of converting them to cash without records or a proper accounting and thus depriving the heirs and creditors of the Estate from the shares of that property to which they are entitled;

j. Seizing assets of the Estate without first properly accounting for them, and then moving them with the purpose of selling or otherwise converting them for their own benefit and depriving the rightful heirs and creditors from their entitlement;

k. Converting and selling assets of the Estate, including cash, art work, securities, bonds and certificates of deposit, without authority and then taking the proceeds for their benefit;

l. Falsifying documents to conceal Estate assets and documents;

    m. Interfering with and blocking the gifts provided to Plaintiffs by Sidney
        Rothberg during his lifetime;

    n. Retaining and converting money and property that had been given to
        Plaintiffs; and

    o. Destroying Estate records to further conceal their activities and prevent the
        rightful heirs, creditors and beneficiaries from securing their entitlements.

223.    The Enterprises, Marger, Ingram, Markovitz, Comedy Cures, Lauriel Marger, John

and Jane Does 1 through 20 and ABC Corporations A through Z, continued to violate the criminal

conduct statutes of theft by deception, conspiracy, forgery and RICO by: (a) permitting Marger to

steal the Estate's assets; (b) failing to account for assets of the Estate and misrepresenting those

assets to the authorities, proper beneficiaries, creditors and heirs; (c) by denying the rightful

creditors, beneficiaries and heirs access to a proper accounting of the Estate's assets; (d) by

submitting false documents to courts, government entities and others, including Sidney himself; (e)

diverting assets of the Estate to other "safe harbors" where Marger and her daughter Lauriel could

benefit from them while concomitantly concealing them from the government and from the

rightful heirs, beneficiaries and creditors; and (f) retaining and converting money and property that

had been given to Plaintiffs inter-vivos.

224.    Plaintiffs are the victims of Marger and her co-conspirators' activities and predicate

acts.

225.    In furtherance of and interwoven with the on-going pattern of racketeering to (a)

extract money and property of the Estate to which others are entitled on false pretenses, (b) hide

the assets of the Estate so that beneficiaries, heirs and creditors would be unable to access them,

and (c) liquidate and distribute assets of the Estate for their benefit; in May of 2008, the

Enterprises, Marger and her co-conspirators continued their "Pattern of racketeering activity"

through acts of "Conspiracy," "Forgery," and "Theft by deception," as set forth in N.J.S.A §

2C:20-4, 2C:5-2, and 2C:21-1, by delaying the reporting of Sidney's death for more than two

weeks, by clearing Sidney's residence in New York City of over 600 paintings, hundreds of

porcelains, fine china, terra cotta, rare books, gold and silver figurines, statuary, jewelry and rugs prior to reporting his death, by continuing to use Sidney's accounts at Meryl Lynch, UBS, RBC and J B Hanauer & Co, among others, as if Sidney was still alive (with the exception of North Fork, which the Social Security Administration notified and which then froze all accounts pending probate), by placing Sidney in a morphine-induced coma in May 2008 while concomitantly using $2.5 million of his money to purchase the Tenafly Property, for Marger and her daughter; in May and June of 2008, gifting Sidney's assets without Sidney's knowledge or authorization, misrepresenting the assets of the Estate in furtherance of their conspiracy; in May 2008 falsifying filings with the Court of Common Pleas, Orphans Court by, among other things, representing to various courts that the Estate was only valued at $5 million in one instance and $10 million in another instance, when it is worth significantly more than that; misrepresenting Marger's legal authority so that Marger and her co-conspirators could rob the Estate of all its assets. .

226.    The Enterprises, Marger and her co-conspirators, individually and as agents for the Estate and Comedy Cures, engaged in a "Pattern of racketeering activity", consisting of "Prohibited activities", including "Conspiracy", as well as criminal activities under the laws of New Jersey, including "Theft by deception" and "Forgery and related offenses", which were interconnected and interrelated with Plaintiffs as victims.

227.    As a direct and proximate result of the related and continuing racketeering and prohibited activities in which the Enterprises, Marger and her co-conspirators participated, Rothberg has been damaged, in that:

      a.  He has been deprived of his inheritance;

      b.  Money that had been given to him during Sidney's lifetime (e.g. the $1 million in certificates of deposit) were wrongfully converted by Marger rather than paid to Rothberg;

      c.  He has been deprived of other assets that were given to him during Sidney's lifetime (e.g. the 66th Street Co-op and all its contents, the artwork that had been promised to him, the monthly allowances that had been paid to him by Sidney

during Sidney's life, the annual vacations and shopping sprees, the wardrobes, the annual $40,000 birthday presents, the health and dental insurance, the $5.5 million in the UBS trading accounts and the $2.5 million in cash that Sidney had promised him before he died, as well as all the men's jewelry and the Frank Lloyd Wright Dining Room set);

    d.   The proceeds of the trusts that had been created by Sidney for Rothberg's benefit;

228.    As a direct and proximate result of the related and continuing racketeering and prohibited activities in which the Enterprises, Marger and her co-conspirators participated, Plaintiffs have been damaged, in that they were deprived of the interest in the Premises and the consideration promised to them in return for the Irrevocable Trust and Assignment, as well as the maintenance for the assets of the Irrevocable Trust.

229.    Based upon the foregoing, Plaintiffs are entitled to damages pursuant to N.J.S.A. § 2C:41 entitled "Racketeering" and N.J.S.A § 2C:41-4 entitled "Civil Remedies" including, but not limited to:

    a.   N.J.S.A. § 2C:41-4.a.(7), the restitution of all moneys unlawfully obtained or retained by Marger and the Estate, the Enterprises, and any of the benefitting co-conspirators, as they violated N.J.S.A. § 2C:41-2, as heretofore set forth; and

    b.   N.J.S.A. § 2C:41-4.a.(10).c, threefold any damages Rothberg sustained and the cost of the suit, including a reasonable attorney's fees, costs of investigation and litigation.

**WHEREFORE**, Plaintiff Michael S. Rothberg respectfully request judgment against the Defendants, jointly and severally, for application of a constructive trust over all Estate assets, appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the funds owed to Rothberg, for an order awarding Rothberg the amounts owed to him for the CDs, the two trusts, his share of the value of SMR, continuation of the payment of all his expenses in the manner established during Sidney Rothberg's life, as described herein, payment of the $5.5 contained in the UBS account and the $2.5 million in cash, as well as the residence in New York at 66th Street and all its contents (or the value of the contents), all the men's jewelry held by the Estate at the time of Sidney Rothberg's death (or the

value thereof), and the Frank Lloyd Wright Dining Room Set, together with all additional amounts necessary to bring Rothberg's acquisitions to 50% of the Estate, or an additional 50% of the remainder, as mandated in the 1970s Will, together with interest, his attorneys' fees and costs of suit, and any and all other relief deemed equitable and just by this Court; and

Plaintiffs respectfully request judgment against the Defendants, jointly and severally, for: (a) fully insuring and maintaining the Premises until it could be torn down and a new high quality residence, all costs and expenses for which would be covered by Marger as Administratrix of the Estate, could be built and occupied by Plaintiffs, and then fully insuring and maintaining that new home, including, without limitation, all maintenance, repairs, insurance, furnishing, appliances and fixtures; (b) an annual allowance for vacations comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (c) an apartment in New York City at absolutely no cost to Plaintiffs that they could use throughout their lives and that they could then give to their daughter, Tara; (d) $100,000.00 for their daughter Tara's wedding; (e) a $1,000,000.00 trading account for Michael Rothberg to use in his absolute discretion for commodities and stock trading for his exclusive benefit; (f) annual shopping sprees comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (g) new cars for Michael and Theresa (including the services of a driver for Michael when necessary); (h) medical and dental insurance for their lifetimes; and (i) any and all available technology and education for blind persons; as well as for appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the consideration owed to Plaintiffs, for an order awarding Plaintiffs the amounts owed to them in consideration for the Assignment and trust agreements, together with interest, attorneys' fees and costs of suit, and any and all other relief deemed equitable and just by this Court and the relief specified by statute.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff requests, pursuant to Federal Rule of Civil Procedure 38(b), that all of the issues in this matter be tried to a jury.

**BISGAIER HOFF, LLC**
By:＿＿ s/ James A. Kozachek ＿＿＿＿＿＿
 James A. Kozachek, Esquire (JK 5657)
 21 Tanner Street
 Haddonfield, NJ 08033
 Telephone: 856-795-0150
 Facsimile: 856-795-0312

September 22, 2011    Attorneys for Plaintiffs