<u>NOT FOR PUBLICATION</u>                    (Document Nos. 120-21, 123, 125-26)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | | |
|---|---|---|
| _____ : | | |
| MICHAEL S. ROTHBERG and | : | |
| THERESA ROTHBERG, | : | |
| | : | Civil No. 11-5497 (RBK/KMW) |
| Plaintiffs, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| | : | |
| SARANNE ROTHBERG MARGER | : | |
| (individually and as Administratrix of | : | |
| The Estate of Sidney Rothberg), | : | |
| THE ESTATE OF SIDNEY ROTHBERG | : | |
| NELLIE INGRAM, ALAN MARKOVITZ, | : | |
| MARK JONES, WELLS FARGO BANK, | : | |
| GEORGE BRANDT, | : | |
| CAPITAL ONE BANK, | : | |
| JOHN and JANE DOES 1-20, and | : | |
| ABC CORPORATIONS A through Z | : | |
| | : | |
| Defendants. | : | |
| _____ : | | |
| | : | |
| LYNN ROTHBERG KEARNEY, | : | |
| | : | |
| Intervenor Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SARANNE ROTHBERG MARGER, | : | |
| et al., | : | |
| | : | |
| Intervenor Defendants. | : | |
| _____ : | | |

**KUGLER**, United States District Judge:

1

This matter arises upon Plaintiffs Michael Rothberg's ("Michael") and Theresa Rothberg's ("Plaintiffs") Complaint against Defendants Saranne Rothberg Marger ("Saranne," "Marger" or "Defendant Marger"); Nellie Ingram ("Ingram" or "Defendant Ingram"); Alan Markovitz, Esq. ("Markovitz" or "Defendant Markovitz"); Mark Jones ("Jones" or "Defendant Jones") and Wells Fargo Bank as successor to Wachovia Bank, NA; and George Brandt ("Brandt" or "Defendant Brandt") and Capital One Bank as successor to North Fork Bank (collectively, "Defendants") concerning the estate of Sidney Rothberg.  Currently before the Court are Defendants' motions to dismiss Plaintiffs' Amended Complaint (Doc Nos. 120-21, 123, 125-26).  For the reasons expressed below, the Court will grant Defendants' motions to dismiss.

## I.      FACTUAL AND PROCEDURAL BACKGROUND[1]

On May 13, 2008, Sidney Rothberg died at eighty-three years of age, leaving behind an estate ("the Estate") allegedly worth up to $200,000,000.  Am. Compl. ¶ 22.  Sidney and his wife raised two children: Michael S. Rothberg and Saranne Rothberg Marger.  *Id.* at ¶ 23.  The essence of Plaintiffs' claims is that Michael Rothberg is entitled to a 50% share of the Estate, and that Saranne Marger, working individually as well as in concert with the other Defendants, used unlawful means to cause Sidney Rothberg to execute two testamentary instruments (first in 1994 and then again in 2002) which conferred the vast majority of the Estate to Saranne's exclusive control while leaving only a relative pittance to her brother.  The Amended Complaint also alleges that Saranne breached obligations under an agreement with Plaintiffs concerning Plaintiffs' home.  Given the nature of Plaintiffs' claims, and the Court's basis for granting

---

[1] When considering the sufficiency of the factual allegations in a plaintiff's complaint, the Court, for purposes of deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), assumes such allegations to be true.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

Defendants' motions to dismiss them for lack of jurisdiction, it is necessary to recount in some detail the allegations in Plaintiffs' 229-paragraph Amended Complaint.

**A.      Count One: Breach of Fiduciary Duty by Saranne Marger**

In the mid-1970s, Sidney Rothberg prepared a will that left the entirety of his estate in equal shares to his two children: Michael and Saranne ("1970s Will").  Am. Compl. ¶ 25.  Then, in 1994, Sidney fell ill, having to undergo a coronary angioplasty procedure.  *Id.* ¶ 33.  He went to stay with Saranne at her New York apartment.  During this stay, while Sidney was "heavily medicated, sedated, vulnerable and susceptible," Saranne caused him to modify the 1970s Will with a new one ("1994 Will"): this version left only a certain work of art to Michael Rothberg, while everything else, save a small sum of money for Sidney's housekeeper Nellie Ingram, who witnessed this testamentary modification, went to Saranne.  *Id.* at ¶ 35.

Some years later, in 2002, Saranne hatched a scheme to create new fraudulent will.  She had Sidney sign a blank piece of paper, had his doorman provide a witness's signature, and then subsequently typed onto that piece of paper the new will's terms.  *Id.* at ¶ 53.  This 2002 Will had the following terms: $5,000 to Nellie Ingram; a particular painting or cash equivalent as well as interest and principal on $120,000 worth of bonds to Michael Rothberg; and the remainder of the Estate to Saranne Marger ("2002 Will").  *Id.* at ¶¶ 41-42.

In 2007, Sidney's declining health resulted in his moving to the Russ Berrie Home for Jewish Living in Rockleigh, New Jersey, so that he could receive more constant medical care.  *Id.* at ¶¶ 63-65.  Michael Rothberg visit his father frequently during this time.  In the course of their conversations, Sidney promised Michael a number of testamentary gifts, including certain real property in New York city and the contents of a UBS brokerage account.  *Id.* at ¶¶ 77-80.  At

this same time, Saranne, without Sidney's knowledge or consent, transferred out of Sidney's possession almost $3.75 million in cash. *Id.* at ¶¶ 82-84.

Finally, Sidney died on May 13, 2008. For seventeen days, Saranne did not reveal his death to anyone. Instead she took action in conjunction with her attorney Defendant Alan Markovitz to misappropriate and conceal certain assets of the Estate. *Id.* at ¶ 100. Next, she ordered Defendant Ingram to destroy all of the documents that Sidney kept in his two-story condominium in Philadelphia, while herself destroying any other documents she could find regarding Sidney's properties, interests, assets, and intentions. *Id.* at ¶ 102.

From these allegations, Plaintiffs claim that Saranne Marger breached her fiduciary duty to Plaintiffs.

## B. Count Two: Tortious Interference with Payment of Estate Obligations by all Defendants

Plaintiffs' tortious interference claim rests upon similar allegations as those presented in Count One. That is, they charge all defendants with taking action to frustrate the testamentary intent of Sidney Rothberg by siphoning off his assets before and after his death, destroying documents, including the 1970s Will, and committing other fraudulent acts.

Specifically, Saranne Marger, with the help of Defendants Brandt, Jones, and their respective financial institutions, diverted millions of dollars out of Sidney's accounts into her own control using a fraudulent power of attorney. *Id.* at ¶ 133. When Sidney tried to recover these funds, Saranne prevailed upon the Defendants Brandt and Jones to thwart these efforts. *Id.* Finally, when Michael confronted his sister about the way she was managing Sidney's estate, Saranne sought a restraining order in New Jersey state court to prevent him from receiving the gifts promised him by Sidney. *Id.* at ¶ 144.

4

**C.      Count Three: Breach of Assignment and Trust Agreements by Saranne Marger**

Count Three of Plaintiffs' Amended Complaint concerns a home that Sidney agreed to purchase and maintain for Plaintiffs.  He wrote checks totaling $350,000 to a real estate attorney to purchase a home in Woodbine, New Jersey (the "Woodbine Property").  *Id.* at ¶ 149.  The closing was scheduled for May 30, 2008.  On May 13, however, Sidney died.  Given this circumstance, Saranne Marger, along with Defendant Markovitz, approached Plaintiffs with a proposal: if Plaintiffs assigned their interests in the Woodbine Property to an Irrevocable trust controlled by Saranne and her daughter, then Plaintiffs would be provided with the following consideration[2]:

> (a) fully insuring and maintaining the [Woodbine Property] until it could be torn down and a new high quality residence, all costs and expenses for which would be covered by Marger as Administratrix of the Estate, could be built and occupied by Plaintiffs, and then fully insuring and maintaining that new home . . .; (b) an annual allowance for vacations comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (c) an apartment in New York City at absolutely no cost to Plaintiffs that they could use throughout their lives and that they could then, in time, give to their daughter, Tara; (d) $100,000 for their daughter Tara's wedding; (e) a $1,000,000.00 trading account for Michael Rothberg to use in his absolute discretion for commodities and stock trading for his exclusive benefits; (f) annual shopping sprees comparable to the ones Sidney Rothberg had given Plaintiffs during his lifetime; (g) new cars for Michael and Theresa (including the services of a driver for Michael when necessary); (h) medical and dental insurance for their lifetimes; and (i) all available technologies and education available for the blind for Rothberg.

*Id.* at ¶ 156.  Saranne represented that both she and the Estate would be bound to provide this promised consideration.  *Id.* at ¶ 157.  To date, Plaintiffs have not received any of these assets or benefits.  *Id.* at 159.

---

[2] This alleged consideration was not included in the assignment itself, but was enumerated orally to Plaintiffs by Saranne Marger.

**D.      Count Four: Fraud and Fraudulent Inducement by Saranne Marger and Alan Markovitz**

This count makes no new allegations, but simply recasts the alleged acts of Saranne Marger and Alan Markovitz as evidencing fraudulent, rather than simply tortious, behavior. *See id.* ¶¶ 164-170.

**E.      Counts Five and Six: Violations of the Federal RICO Statute**

Again, there are scant new allegations found in Counts Five and Six. In an effort to state a valid claim under the state and federal Racketeer Influenced and Corrupt Organizations ("RICO") statutes, Plaintiffs allege that Defendants conspired with one another for the purpose of diverting assets from Sidney Rothberg's Estate and concealing them from the Estate's beneficiaries, including Plaintiffs. *Id.* at ¶ 174. Consequently, these acts include moving various tangible property and liquid assets across state lines and out of the country, fraudulently inducing Plaintiffs to assign their rights to the Woodbine House, destroying Sidney Rothberg's personal records, and failing to pay taxes owed by the Estate. *Id.* at ¶¶ 175-186.

**F.      Requested Relief**

For all six counts,[3] Plaintiffs seek the following relief:

> [A]pplication of a constructive trust over all Estate assets, appointment of a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the funds owed to [Michael] Rothberg, for an order awarding [Michael] Rothberg the amounts owed to him for the CDs, the two trusts, his share of the value of SMR [a corporation created by Sidney Rothberg for the purpose of buying and selling artwork], continuation of the payment of all his expenses in the manner established during Sidney Rothberg's life . . . , payment of the $5.5 million contained in the UBS account and the $2.5 million in cash, as well as the

---

[3] Plaintiffs seek this relief against Saranne Rothberg in Counts One and Three; against Saranne Rothberg and Alan Markovitz, jointly and severally, in Count Two; and against all Defendants, jointly and severally, in Counts Two, Five, and Six.

> residence in New York at 66th Street and all its contents (or the
> value of the contents), all the men's jewelry held by the Estate at
> the time of Sidney Rothberg's death (or the value thereof), and the
> Frank Lloyd Wright Dining Room Set, together with all additional
> amounts necessary to bring Rothberg's acquisitions to 50% of the
> Estate, or an additional 50% of the remainder, as mandated in the
> 1970s Will, together with interest, his attorneys' fees and costs of
> suit, and any and all relief deemed equitable and just by this Court.

Compl.  Moreover, in Counts Three, Five, and Six, Plaintiffs ask the Court to provide the

allegedly promised consideration arising out of the assignment of their interest in the Woodbine

Property.  *Id.*

## II.   LEGAL STANDARD

### A.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

Rule 12(b)(1) permits a court to dismiss a case for lack of subject-matter jurisdiction.

Motions under Rule 12(b)(1) may be "facial" or "factual" challenges to the court's jurisdiction.

*Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). When the moving

party supports its motion with a sworn statement of facts, "the court should treat the . . .

challenge as a factual attack on jurisdiction."  *Med. Soc'y of N.J. v. Herr*, 191 F. Supp. 2d 574,

578 (D.N.J. 2002).  A factual challenge "may occur at any stage of the proceedings, from the

time the answer has been served until after the trial has been completed."  *Mortensen*, 549 F.2d

at 891-92.  During a factual challenge, "no presumptive truthfulness attaches to [the] plaintiff's

allegations" and the court may consider and weigh evidence outside of the pleadings.  *Id.* at 891.

The plaintiff bears "the burden of proof that jurisdiction does in fact exist."  *Id.*

A facial challenge, on the other hand, is one in which a defendant argues "that the

allegations on the face of the complaint, taken as true, are insufficient to invoke the court's

jurisdiction."  *Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 300 & n.4 (3d Cir. 2002).

### B.   Motion to Dismiss for Failure to State a Claim upon Which Relief Can Be Granted

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To make this determination, a court conducts a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675).  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 680).  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 680).  This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. *Id.*

## III.    DISCUSSION

### A.    Probate Exception

Defendants argue that all claims against them must be dismissed for lack of subject matter jurisdiction because they are barred by the so-called probate exception to federal diversity jurisdiction.  *See Marshall v. Marshall*, 547 U.S. 293, 311-12 (2006).  That is, because the parties are entrenched in a fierce battle over the probate of Sidney Rothberg's will and the administration of his Estate in Pennsylvania Orphans' Court, the Court is without jurisdiction to decide Plaintiffs' claims and provide their requested relief.  Plaintiffs respond that the relief they seek does not implicate this exception because, among other things, they seek only *in personam* judgments against Defendants for the acts which allegedly caused Plaintiffs' injuries.

Had Plaintiffs asserted these claims only a few years ago, the Court, adhering to the Supreme Court's and the Third Circuit's longstanding precedents, would have quickly determined that the probate exception to federal jurisdiction barred it from hearing any of Plaintiffs' claims.  *See Markham v. Allen*, 326 U.S. 490 (1946); *Golden v. Golden*, 382 F.3d 348, 360-62 (3d Cir. 2004) (taking a "fairly broad view of the types of actions that interfere with . . . probate proceedings" and declining to exercise jurisdiction over a party's undue influence, forgery, and breach of fiduciary duty claims).  However, in 2006, the Supreme Court narrowed considerably the breadth of the probate exception, explaining that it

> reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court.  But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

*Marshall v. Marshall*, 547 U.S. at 311-12.  Having thusly limited the probate exception, the Court held that a federal district court had jurisdiction to hear an *in personam* damages claim for tortious interference with an expected inheritance, even though the estate from which that inheritance was expected was subject to ongoing Texas probate court proceedings.  *Id.* at 312.

The Court found that the claimant's *in personam* cause of action against the alleged tortfeasor did not implicate any of the three components of the probate exception.  *Id.*

      i.      *In rem jurisdiction over estate assets*

The Third Circuit has since recognized that the probate exception will not apply unless a claim for relief requires a federal court to (1) probate or annul a will, (2) administer a decedent's estate, or (3) assume *in rem* jurisdiction over property that is in the custody of the probate court." *Three Keys Ltd. v. SR Utility Holding Co.*, 540 F.3d 220, 227 (3d Cir. 2008).  In *Three Keys*, the Third Circuit had occasion to grapple with the breadth the third prong of the probate exception. The estate in question included 100% of the shares of stock in the defendant company SR Utility Holding Co.  The executor of the estate sold 24% of the SR stock to another entity he created called Three Keys Ltd.  *Id.* at 222.  In the face of litigation by interested parties, he agreed to place the dividends owing on the 24% interest into an escrow account, but then sued various parties for interfering with his alleged right to access those dividends.  *Id.* at 224.  His complaint named SR itself, the Estate, a bank, and an individual, who together owned the remaining 76% of SR's shares.  His five causes of action included *in personam* claims alleging breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and civil conspiracy.  *Id.* at 224-25. The Complaint sought a declaration that the original sale of the 24% interest in SR was valid, an injunction granting payment of the dividends, and compensatory and punitive damages.

The *Three Keys* court held that all of these claims were to be dismissed for lack of jurisdiction under the "*in rem*" prohibition of the probate exception.  All of Plaintiff's claims, the court noted, rested on the assumption that it had a valid ownership interest in SR.  *Id.* at 227. Further, 100% of the shares of SR were in the possession of the testator at the time of his death, and thus, having become part of the testator's estate, "became property under the exclusive

jurisdiction of the Orphans' court." *Id.* at 228.  Although four of the complaint's five counts requested the exercise of *in personam* jurisdiction, such fact was not sufficient, by itself, to endow the federal court with jurisdiction. *Id.* at 229-30.  Rather, the court looked beyond the style of the complaint itself and found that the nature of the plaintiff's theory of relief required a district court to determine various parties' rights and interests in specific estate property. *Id.* at 229-30 (recognizing that plaintiff's claims in their essence sought a determination that Three Keys's "interest in the SR Utility shares and dividends [was] superior to the interest of the Estate.").  The court therefore found that each of the claims, "whether characterized as an *in personam* action or not, requires the District Court to 'endeavor[] to dispose of property that is in the custody of a state probate court." *Id.* at 230 (citing *Marshall*, 547 U.S. at 312) (modification in original).

Thus, the court urged district courts to adopt a functional approach to applying the *in rem* prohibition of the probate exception: instead of relying solely on the face of the complaint before it, a court's task is to appreciate the "distinction between an *in personam* action seeking judgment that a party has the right to a distributive share of an estate, but stopping short of determining a party's interest in specific estate property, and an *in rem* action . . . which seeks a determination of a party's interest in specific property in the custody of the probate court." *Id.* Having determined that all of the plaintiff's claims necessarily entailed an *in rem* component, the court ordered that all aspects of those claims, including the related prayers for compensatory and punitive damages, be dismissed for want of jurisdiction. *Id.*

ii.  *Actions requiring a district court to declare invalid a testamentary document*

The first prong of the probate exceptions bars federal courts from hearing actions to "probate or annul a will." *Marshall*, 547 U.S. at 311.  Courts have recognized that this

prohibition bars federal jurisdiction over any claims for relief that require a finding that a will subject to probate proceedings in state court is invalid. In *Wisecarver v. Moore*, 489 F.3d 747 (6th Cir. 2007), the court read the plaintiffs' claims to allege that the defendants, through various tortious acts, received assets from the testator during his lifetime to which plaintiffs had a testamentary claim. *Id.* at 750. The court allowed this *in personam* claim against the defendants to proceed because the claim alleged that the assets sought "were allegedly transferred during [the testator's] lifetime and were therefore not part of his estate at his death." *Id.* However, the appeals panel provided the following clarification:

> We are careful to limit Plaintiffs' claims to money damages related to the allegedly improper *inter vivos* transfers. To the extent that Plaintiffs' claims for breach of fiduciary duty, fraud, or undue influence seek money damages equal to the amount of the probate disbursements, awarding such damages would clearly be prohibited by the probate exception since it would be tantamount to setting aside the will.

*Id.* at 750 n.1; *accord Schweers v. Stewart*, No. 09-236, 2010 WL 996467 at *3 (E.D. Ky. Mar. 16, 2010). Thus, the *Wisecarver* court distinguished between claims against assets not alleged to be part the estate, and thus not implicating the validity of the will disposing of estate assets, and those aimed at estate assets which would require a federal court to determine the validity or invalidity of a contested will.

Courts in this district have similarly recognized that the probate exception bars federal jurisdiction when a party's theory of recovery requires a district court to determine a testamentary document to be invalid. *See Berman v. Berman*, No. 07-2506, 2009 WL 1617758 at *2 (D.N.J. June 9, 2009) (finding lack of federal jurisdiction under the first prong of the probate exception because the theory of the defendant's affirmative defense required the court to find that "the will underlying Plaintiff's claim is void and unenforceable, [and thus] would call

upon the Court to determine whether or not to 'annul a will') (citing *Three Keys*, 540 F.3d at

277); *Solow v. Berger*, No. 10-2950, 2011 WL 1045098 at **1-2 (E.D. Pa. Mar. 22, 2011).

(finding that jurisdiction over plaintiffs' claims for fraudulent misrepresentation of the validity of

a will and civil conspiracy was barred by the first prong of the probate exception because

"plaintiffs here allege that defendants misrepresented the validity of the 1996 will and that

Decedent's true testamentary intent is embodied in the writing she signed in November 2007

(which comports with [a] 1994 will). Thus, for plaintiffs to recover . . . there would have to be

findings that the 1996 will is invalid and that the 1994 will is valid, effectively requiring the

Court to annul the 1996 will and probate the 1994 will").

## IV.    ANALYSIS

With the foregoing principles of federal jurisdiction over probate-related claims in mind,

the Court turns to the causes of action in Plaintiffs' Amended Complaint.

### A.    The Court's jurisdiction to award Plaintiff specific Estate Assets

*i.    Estate Properties*

As stated above, Plaintiffs seek the following relief in all six counts of their Amended

Complaint:

> [A]pplication of a constructive trust over all Estate assets,
> appointment of a third-party auditor and administrator of the Estate
> to account for assets of the Estate and distribute the funds owed to
> [Michael] Rothberg, for an order awarding [Michael] Rothberg the
> amounts owed to him for the CDs, the two trusts, his share of the
> value of SMR [a corporation created by Sidney Rothberg for the
> purpose of buying and selling artwork], continuation of the
> payment of all his expenses in the manner established during
> Sidney Rothberg's life . . . , payment of the $5.5 million contained
> in the UBS account and the $2.5 million in cash, as well as the
> residence in New York at 66th Street and all its contents (or the
> value of the contents), all the men's jewelry held by the Estate at
> the time of Sidney Rothberg's death (or the value thereof), and the
> Frank Lloyd Wright Dining Room Set, together with all additional

> amounts necessary to bring Rothberg's acquisitions to 50% of the
> Estate, or an additional 50% of the remainder, as mandated in the
> 1970s Will, together with interest, his attorneys' fees and costs of
> suit, and any and all relief deemed equitable and just by this Court.

It is quite clear that Plaintiff is asking the Court to exercise jurisdiction over specific property that the Amended Complaint quite clearly acknowledges is part of the Estate and thus is within the control of the Pennsylvania Orphans' court.  This is exactly the type of *in rem* jurisdiction that triggers the third prong of the probate exception and renders federal jurisdiction improper.  *See Three Keys*, 540 F.3d at 230 (finding that the probate exception prohibits a district court from endeavoring "to dispose of property that is in the custody of a state probate court").  Thus, the Court declines to exercise jurisdiction over Plaintiffs' claims to the extent they seek a judgment 1) creating constructive trust over all Estate assets; 2) awarding Michael Rothberg Estate property including various Certificates of Deposit, two trust accounts, a share of a company, a lifetime payment of an allowance, the contents of a UBS brokerage account, $2.5 million in cash, a residence in New York City at 66th street, the contents of that residence, men's jewelry, a Frank Lloyd Wright Dining Room Set, and an additional cash award from the Estate that would render Michael Rothberg a 50% beneficiary of the Estate's corpus.[4]

> ii.    *Woodbine Property Trust*

The Court reaches a similar conclusion with respect to Plaintiff's claims concerning the Irrevocable Trust that contains the Woodbine Property.  The Complaint makes clear that in April 2008, Sidney placed $350,000 of his own money in an escrow account to purchase this house.  *See* Am. Compl. ¶¶ 149, 152.  Before any further action was taken to purchase the house, Sidney died.  *Id.* ¶ 152.  Thus, this $350,000 remained in Sidney's effective possession at the time of his

---

[4] In addition, to the extent Plaintiffs ask the Court to appoint "a third-party auditor and administrator of the Estate to account for assets of the Estate and distribute the funds owed" to Michel Rothberg, such relief is clearly barred by the second prong of the probate exception prohibiting Courts from "endeavoring to . . . administer a decedent's estate."  *Three Keys*, 540 F.3d at 227 (citing *Marshall*, 547 U.S. at 311-12).

death, and thus became property of the Estate and is now under the exclusive jurisdiction of the Pennsylvania Orphans' court. *See Three Keys*, 540 F.3d at 227-28 (noting that under "Section 711 of the Pennsylvania Probate, Estates and Fiduciaries Code, the Orphans' Court has exclusive jurisdiction over the distribution of a decedent's estate, which includes the decedent's personal property at the time of his or her death"). That Saranne Marger, as administratrix of Sidney's estate, eventually used this $350,000 to purchase the Woodbine Property, and then executed a document to hold that house in a trust, does not divest the Orphans' Court of any jurisdiction over this property.[5]

Plaintiffs seek a judgment that they are owed certain consideration arising out of the Woodbine Property trust agreement. However, because the trust remains an Estate asset, the Court would have to assume *in rem* jurisdiction over it in order to determine whether Plaintiff has any rights in the trust, whether the trust was validly executed, and what recovery, if any, Plaintiff is due. This is exactly the sort of adjudication specifically barred by *Three Keys*. *See* 540 F.3d at 230 (describing an *in rem* action as involving "a determination of a party's interest in specific property in the custody of the probate court"). Thus, under the third prong of the probate exception, the Court has no jurisdiction over Plaintiff's claims involving the Woodbine Property Trust.

**B.     The Court's jurisdiction to award Plaintiff in personam judgments based on his theory of recovery**

---

[5] The *Three Keys* court specified the executor (or administrator, if the will does not specify an executor) of an estate is an officer of the probate court and thus subject to that court's jurisdiction and control. *Id.* at 228 (citing *Byers v. McAuley*, 149 U.S. 608, 615 (1893)). Thus, the probate court maintains jurisdiction to determine the validity of actions by an administrator concerning estate property. *Three Keys* involved the validity a sale of specific estate property by an executor; this case involves the validity of a trust over estate property created by an administratrix. The result is the same: the probate court retains exclusive jurisdiction over specific estate property, which includes the power to determine the validity of an administratrix's (or executor's) actions concerning that property.

Plaintiffs specify that they seek in personam judgments against at least some Defendants in amounts equal to 50% of Sidney Rothberg's estate.  Pls.' Opp. Br. to Def. Wells Fargo's Mot. to Dismiss Pl.'s Am. Compl. 7.  The quintessence of Plaintiffs' theory of entitlement to these damages appears to be that he is entitled to half of Sidney Rothberg's estate, and thus he was injured by all of Defendants' allegedly tortious and illegal acts to siphon off assets from the Estate before and after Sidney's death, and to prevent Sidney from expressing his true testamentary intent.

It is quite clear to the Court that entering a judgment in favor of Plaintiff on this theory would necessary entail a finding that the 2002 Will which is the subject of the probate proceedings in the Pennsylvania Orphans' Court is invalid, and that some other testamentary scheme, either the 1994 Will, or possibly intestate succession, renders Plaintiff entitled to 50% of the Estate's assets.  The Court thus has no jurisdiction to grant Plaintiff any relief on this theory of recovery because doing so would require it to "annul a will," the validity of which is currently being considered in a state probate proceeding.  *Accord Wisecarver*, 489 F.3d at 750; *Solow*, 2011 WL 1045098 at **1-2.  The Court will not arrogate to itself the power to make determinations that lie at the core of state probate matters.

**C.**     **Plaintiff's claims regarding interference with an *Inter Vivos* or testamentary Gift**

All that remains of Plaintiffs' Amended Complaint are the allegations in Count Two (and incorporated by reference into the state and federal RICO counts) claiming that Defendants unlawfully interfered with an expected gift or inheritance that Sidney planned to make to Michael Rothberg.  To summarize, Plaintiffs claim that Sidney had expressed his intention that Michael receive half of the Estate, and also made specific promises near the time of his death to leave certain property to Michael.  However, Defendants' unlawful conduct, Plaintiffs assert,

prevented Sidney from effectuating that promise, presumably by modifying his will or making some sort of *inter vivos* gift.

      As an initial matter, the Court finds that this aspect of Plaintiffs' Amended Complaint is *not* barred by the probate exception.  Rather, because Plaintiffs claim that Defendants' conduct prevented Plaintiffs from receiving gifts that Sidney allegedly promised them, and because they bring an *in personam* action seeking personal liability against Defendants to recover for their resulting injuries, this is exactly the type of probate-related tort claim for relief authorized by the Supreme Court in *Marshall*.  *See* 547 U.S. at 304 (holding that district court had jurisdiction to hear a claim that the defendant used tortious means to prevent the creation of an *inter vivos* trust that the decedent had intended to provide to the plaintiff).  Unlike Plaintiffs' other theories of recovery, the Court can award damages against Defendants for such interference without having to make any determination about the validity or invalidity of Sidney's will.

      Although this theory of recovery is not barred by the probate exception, the Court must still consider whether Plaintiffs have made sufficient factual allegations to sustain a plausible claim for relief.  *See* Fed. R. Civ. P. 12(b)(6); *Iqbal*, 556 U.S. at 678.  In so doing, the Court, still mindful of the necessity not to entertain a claim that depends on a finding that the will currently before the state probate court is invalid, must limit its consideration of Plaintiffs' factual allegations.  Specifically, in order to find that Plaintiffs have stated a plausible claim for relief, the Court must first find that Plaintiffs have alleged specific facts establishing Defendants' liability to Plaintiffs before it will consider allegations that are relevant only to determining Plaintiffs' alleged damages.  This means that Plaintiffs must show acts taken by Defendants that specific show interference with Sidney's manifest intention to make certain inter vivos or

testamentary gifts to Michael.  With this consideration in mind, the Court first turns to Plaintiffs' federal RICO claim.

i.   *Federal RICO Allegations*

To sustain any action under the federal RICO statute, it is necessary to allege, among other things, a "pattern of racketeering activity."  18 U.S.C. §§ 1962(a)-(c); *accord Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002).  This requirement in turn involves allegations of "at least two acts of racketeering activity," as that term is defined under the statute.  *Id.* § 1961(5).  In addition to actions that violate a list of enumerated federal laws, including those proscribing acts of bank fraud, mail fraud, and money laundering, racketeering activity may also include "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance . . . which is chargeable under State law and punishable by imprisonment for more than one year."  *Id.* § 1961(1).  The list of state law crimes that qualify as predicate acts is an exhaustive one.  *St. Clair v. Citizens Financial Grp.*, 340 Fed. App'x 62, 66 (3d Cir. 2009) (citing *Annulli v. Panikkar*, 200 F.3d 189, 200 (3d Cir. 1999), *overruled on other grounds by Rotella v. Wood*, 528 U.S. 549 (2000)).

Additionally, when these alleged predicate acts involve fraud, as they generally do, a plaintiff's allegations must meet a heightened pleading standard.  *See* Fed. R. Civ. P. 9(b).  Rule 9(b) requires that a party state "with particularity the circumstances constituting fraud."  *Id.*  This heightened pleading standard exists in part to give defendants precise notice of the claims against them, as well as to reduce the number of frivolous lawsuits brought solely to extract settlements.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).  Adherence to Rule 9(b)'s pleading standard is "particularly important in civil RICO pleadings in which the predicate racketeering acts are critical to the sufficiency of the RICO claim."  *Balthazar v.*

18

*Atlantic City Medical Ctr.*, 279 F. Supp. 2d 574, 591 (D.N.J. 2003); *see also Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) ("Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'") (quoting *Figueroa Ruiz v. Algeria*, 896 F.2d 645, 650 (1st Cir. 1990)) (modification in original).

To meet rule 9(b)'s "particularity" standard, a plaintiff must plead "the who, what, when, where, and how: the first paragraph of any newspaper story." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999). This means that a plaintiff must either plead the date, place, or time of the fraud, or use alternative means of "injecting precision and some measure of substantiation" into the allegations of fraud. *Grant v. Turner*, No. 09-2381, 2010 WL 988537 at *8 (D.N.J. Mar. 12, 2010).

In this case, the Court finds that Plaintiffs have failed to allege the existence of two predicate acts that would support their Civil RICO claim. The Court looks to acts alleged in the Amended Complaint and RICO case statement relating to Defendants' alleged attempts to thwart Sidney's efforts to make testamentary or inter vivos gifts to Michael Rothberg. On the other hand, alleged acts designed generally to siphon money and other assets from the Estate before and after Sidney's death are not relevant absent an indication that such money and assets had been promised to Michael.[6] The Court's extensive review of Plaintiffs' filings reveals the following allegations:

---

[6] As noted above, unless Michael can show that Defendants took actions which prevented him from receiving assets that were promised to him by Sidney, or that Defendants prevented Sidney from modifying his will in order to provide additional bequests for Michael, the only other way that Michael could claim an interest in the general assets of the Estate would be to prove that the 2002 Will which is the subject of an ongoing probate proceeding is invalid. The Court cannot maintain a theory of recovery that relies on such a finding.

1. Saranne Marger created a fraudulent Health Care Proxy form in 2002 which specified that Michael Rothberg would not be involved in decisions relating to Sidney's health. RICO Case Statement at 8, ¶ 24.

2. Marger, Brandt, and Jones changed a million dollars worth of certificates of deposit Sidney had marked pay-on-death to Michael so that Michael would never receive that money when Sidney died. They siphoned off hundreds of thousands of dollars from Sidney's accounts and accounts designated for Michael's benefit. *Id.* at 9, ¶ 29.

3. When Plaintiffs tried to take Sidney from the Jewish Home in Rockleigh, New Jersey Marger threatened to have them arrested and enlisted a former police officer to threaten Plaintiffs. *Id.* ¶¶ 34-35.

4. Marger used Jones to help her empty out Sidney's bank accounts in order to further contain Sidney and ensure he did not spend any money. *Id.* ¶ 38.

5. Marger had Sidney put on a combination of prescription drugs which impaired Sidney's mental function. *Id.* ¶ 41.

6. Marger attempted to enlist Michael Rothberg's help in having Sidney declared incompetent. *Id.* ¶ 44.

7. Saranne Marger drugged Sidney into unconsciousness, took him to her house in Tenafly, NJ, and isolated him in a room without proper sustenance or medical care until his death. *Id.* at 17, ¶¶ 49-51.

8. Nellie Ingram and Mark Jones converted millions of dollars in certificates of deposit that had been designated for Michael Rothberg's benefit. *Id.* at 27, ¶ 14.

9. Nellie Ingram regularly transmitted altered, manipulated and fraudulent packages to Sidney. *Id.* at 26, ¶ 11.

10. Alan Markovitz assisted Marger in converting to her own use and ownership millions of dollars of assets which had been owned by Sidney individually or jointly with Michael by creating false and fraudulent documents to support the looting of properties where the assets were being stored at the time of Sidney's death. *Id.* at 30, ¶ 2.

11. Alan Markovitz failed to authorize the Estate to forward to Michael identified inter-vivos gifts, and conspired to prevent Michael from receiving title to Sidney's 66th Street property and all of its contents.  *Id.* at 31, ¶¶ 6-7.

12. Many false and fraudulent documents created by Markovitz were mailed in violation of the law.  *Id.* at 34, ¶ 22.

13. Mark Jones of Wells Fargo Bank failed and refused to follow instructions from Sidney to make and fully fund trusts for Michael. *Id.* at 38, ¶ 14.

14. Wells Fargo falsely and fraudulently converted $1,000,000 in funds away from Sidney and Michael and to Marger and Jones.  *Id.* at 36, ¶ 3.

15. George Brandt would not give Sidney balances and account names despite requests from Sidney to do so and sought to ally with Marger so that he could block Sidney's intentions with respect to the accounts at North Fork bank.  *Id.* at 40, ¶ 2.

16. Saranne Marger, with the assistance of the other Defendants, took numerous steps to block Michael Rothberg's entitlements, including initiating civil proceedings against him in order to enjoin him from interfering with the administration of the estate.  Am. Compl. ¶ 144.

17. Saranne Marger cancelled appointments with three of the top five accounting firms that Sidney wanted to retain in order to do financial planning for the benefit of Michael Rothberg. Am. Compl. ¶ 195.

The Court fails to see how these allegations establish the commission of at least two qualifying predicate acts under the RICO statute.  First, Plaintiffs have failed to allege mail fraud violations under 18 U.S.C. § 1346 in a manner relevant to the alleged interference with Michael Rothberg's expectation of a testamentary or *inter vivos* gift from Sidney.  The alleged mailing of false account statements to Sidney (Allegation #9) concerning his estate bears no specific connection to the issue of whether Defendants took action to prevent him from making good on his alleged promises to make gifts to Michael.  There is no allegation, for instance, that any of

these allegedly fraudulent mailings represented to Sidney that his alleged wishes to provide for Michael had been carried out.  At best they demonstrate efforts by Marger to conceal her alleged theft of *Sidney's* property, not property belonging or promised to Michael.  Thus, the Court cannot consider the mailing of altered account statements as predicate acts supporting Plaintiffs' RICO claim for unlawful interference with an expected inheritance or *inter vivos* gift.

Further, to the extent that Plaintiffs rely on bare assertions of "conversion of assets" or the creation of "false and fraudulent documents" (e.g., Allegations 2, 8, 10, 14) that do relate to assets allegedly intended for Michael, Plaintiffs offer only the sort of general allegations and conclusory statements that are insufficient to satisfy the particularity pleading standard under Federal Rule of Civil Procedure 9(b).  For instance, Plaintiffs have not sufficiently alleged acts of money laundering that relate to Michael Rothberg.  The Federal money laundering statute prohibits knowingly engaging in monetary transactions in criminally derived property worth more than $10,000.  18 U.S.C. § 1957.  Plaintiffs do allege that Marger and other Defendants "changed" $1,000,000 worth of certificates of deposit that were otherwise destined for Michael.  Allegations 2, 8, 14.  But when alleging this fraud, Plaintiffs provide no details that would allow the Court to understand the "when and how" of the conversion, or any other facts that would "inject precision and some measure of substantiation" to this claim.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d at 534; *Grant v. Turner*, 2010 WL 988537 at *8.  Without more, the Court cannot credit this allegation as sufficiently stating a qualifying predicate act under RICO.

Further acts alleged to violate federal money laundering, mail fraud, interstate racketeering, and other federal statutes relate to Defendants' efforts to defraud the estate of Sidney Rothberg, and do not bear any specific relationship to gifts allegedly made to Michael

22

Rothberg.  Thus, the Court will not consider them for purposes of assessing the sufficiency of Plaintiffs' RICO claim.

Finally, the Court could understand the allegation in which Marger apparently drugged Sidney, took him to her home in Tenafly, NJ, and did not provide him with proper sustenance as alleging the state law crime of kidnapping.  Allegation #7 (citing Rico Case Statement 17-18, ¶¶ 49-51).  But even this allegation is problematic.  The crime of kidnapping under New Jersey law involves, in relevant part, "*unlawfully* confin[ing] another for a substantial period" for the purpose of "facilitating commission of any crime or flight thereafter" or "to inflict bodily injury on or to terrorize the victim or another."  N.J.S.A. § 2C:13-1 (emphasis added).  Plaintiffs fail to allege that Marger's keeping Sidney in her New Jersey home amounted to an "unlawful" confinement, given that Marger apparently had been placed in charge of Sidney's care.  Neither do they allege that Marger's purpose in keeping Sidney at her home was to facilitate commission of a future crime or to inflict bodily injury upon him.

The Court finds the rest of the relevant allegations, while surely describing heartless and vindictive behavior, do not establish the commission of crimes that would qualify as one of the enumerated predicate acts under RICO.  *See* 18 U.S.C. § 1961(1).  Without sufficient allegations of at least two predicate racketeering acts, Plaintiffs' RICO claim fails.  Accordingly, the Court will grant Defendants' motion to dismiss Plaintiffs' federal RICO claim.[7]

---

[7] The Court notes that in addition to its determination that Plaintiffs have failed sufficiently to allege at least two predicate acts related to Plaintiffs' theory of unlawful interference with an expected gift or inheritance, Plaintiffs have also not satisfied RICO's pattern requirement.  The Supreme Court has made clear that establishing a pattern of racketeering activity requires a "threat of continued criminal activity."  *Banks v. Wolk*, 918 F.2d 418, 421-22 (3d Cir. 1990) (citing *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989)).  In this case, because Plaintiffs' RICO claim rests on a theory that Defendants acted unlawfully to deprive him of his inheritance, there is no continued threat of harm, because the only person who could have executed such a testamentary gift, Sidney Rothberg, is now deceased.  Thus, the alleged criminal enterprise has served its alleged purpose, and thus poses no threat of repetition or any future harm.  *See Zahl, M.D. v. New Jersey Dept. of Law and Public Safety*, No. 06-3749, 2009 WL 806540 at *7 (D.N.J. Mar. 27, 2009) (finding that the plaintiff's claim failed to establish a continuing

ii.    There exists no diversity jurisdiction over the state law claims

While Plaintiffs' claim may not proceed under the unique vehicle of a RICO action, it is at least theoretically possible that they could assert a valid claim under state law against Defendants for tortious interference with expected inheritance.[8]  However, in order to assert this state law claim in the federal forum, Plaintiffs need to establish proper subject matter jurisdiction.  The Court finds that no diversity jurisdiction exists in this case.

Federal district courts have original jurisdiction over civil actions where the matter in controversy exceeds $75,000 and is between "citizens of different states."  28 U.S.C. § 1332(a)(1).  The Third Circuit has explained that

> [c]itizenship is synonymous with domicile, and "the domicile of an individual is his true, fixed and permanent home and place of habitation.  It is the place to which, whenever he is absent, he has the intention of returning." [citation omitted].  In determining an individual's domicile, a court considers several factors, including "declarations, exercise of political rights, payment of personal taxes, house of residence, and place of business." [citation omitted].  Other factors to be considered may include location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, and driver's license and vehicle registration.

McCann v. Newman Irrevocable Trust, 458 F.3d 281, 286 (3d Cir. 2006).  The proper time for determining a person's citizenship is at the point that the Complaint is filed.  Frett-Smith v. Vanterpool, 511 F.3d 396, 398 n.4 (2008).  Further, Plaintiffs have the burden of establishing diversity of citizenship by a preponderance of the evidence.  Washington v. Hovensa LLC, 652 F.3d 340, 345 (3d Cir. 2011).

---

pattern of racketeering activity when Plaintiff's complaint "allege[d] only a racketeering scheme that has succeeded, ended, and existed only to persecute a single victim").

[8] Defendants argue forcefully that this state law claim does not exist under New Jersey law.  See, e.g., Def. Wells Fargo's Br. in Support of Mot. to Dismiss 23-24 (Doc. No. 34).  Because the Court will dismiss Plaintiffs' state law claims for lack of subject matter jurisdiction, it is not necessary for it to decide whether tortious interference with expected inheritance is a cognizable claim under New Jersey law.

In this case, Plaintiffs allege that they are "residents" of New Jersey.  Am. Compl. ¶¶ 1, 16.[9]  The Court will assume without deciding that they meant to allege that they are "citizens" of the state of New Jersey.  In addition, they allege that Defendant Saranne Marger is a citizen of the state of New York.  Am. Compl. ¶ 4.  Defendant Marger responds that in fact she is a citizen of the state of New Jersey.  If the Court finds that Plaintiffs have failed to carry their burden of demonstrating by a preponderance of the evidence that Defendant Marger is a New York citizen, then it must find that it has no diversity jurisdiction over this civil action.  *See Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010) ("Complete diversity requires that, in cases with multiple plaintiffs or multiple defendants, no plaintiff be a citizen of the same state as any defendant.") (citing E*xxon Mobil Corp. v. Allapattah Svcs. Inc.*, 545 U.S. 546, 553 (2005)).

In this case, Defendant Marger, through certification of her lawyer, submits the following evidence of her New Jersey citizenship:

1. Saranne Marger's declaration that the home that she returns to whenever she is absent is in Tenafly, New Jersey.
2. A voter registration card demonstrating that Marger is registered to vote in New Jersey
3. Marger's 2009 Federal Income Tax forms listing a New Jersey address.
4. Marger's 2010 New Jersey income tax form.
5. Two of Marger's New Jersey driver's licenses (the first valid through September 30, 2011, the second valid through September 30, 2015).
6. Marger's New Jersey vehicle registration certificate (valid through August 2012).

Moffa Cert. (Doc. No. 125).  This evidence responds directly to six of the nine *McCann* factors, and suggests unequivocally that Defendant Marger is a citizen of the state of New Jersey.

---

[9] The Court notes that pleading a party's residency rather than citizenship is alone sufficient reason to dismiss a complaint for failure to properly plead diversity jurisdiction.  *Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972) ("[M]ere residency in a state is insufficient for purposes of diversity.").

In their effort to establish by a preponderance of the evidence that Defendant Marger is in

fact a New York or California citizen[10], Plaintiffs offer the following:

1. Declaration of Plaintiff Michael Rothberg that he "was absolutely certain that Marge was not domiciled at the Tenafly [New Jersey] Property . . . ." Rothberg Decl. ¶ 5 (Doc. No. 133).

2. Michael Rothberg's declaration that he "caused numerous certified mail letters to be sent to Marger at the Tenafly Property, none of which were signed for by Marger." *Id.* ¶ 7.

3. A further declaration by Michael Rothberg that Marger was paying for cable service at two residences in Los Angeles at the time he filed his Complaint and his accompanying belief that Marger was "residing in California at the time [the] Complaint was filed." *Id.* ¶

4. A printout from the website Pinterest showing a thumbnail picture of Marger with the caption "Saranne Rothberg, New York City, NY." Certif. James Kozachek, Exh. B. (Doc. No. 162).

5. A Westlaw search indicating that Marger had cable television services in her name at certain addresses in Los Angeles, California that were connected in May 2011. *Id.*, Exh. D.

6. Theresa Rothberg's declaration that when she sent a process server to Marger's Tenafly, New Jersey address in September 2011, despite repeated attempts, he was unable to serve this process. T. Rothberg Decl. ¶ 31 (Doc. No. 162).

7. Marger's deposition testimony stating the following things:
   a. She transported certain vehicles to California around September 2011. Marger Depo. at 28 (Doc. No. 162)
   b. She maintained residences on a temporary basis in California in 2011 because her daughter received medical care there. *Id.* at 29.
   c. She received awards for her charity work in New York. *Id.* at 38-39.
   d. She met her husband in California. *Id.* at 96.

Reviewing this and other certifications made in the course of jurisdictional discovery, the Court

finds that Plaintiffs have wholly failed to show by a preponderance of the evidence that Marger

---

[10] It appears that in the course of taking jurisdictional discovery, Plaintiffs changed their theory of Marger's citizenship, claiming that she was in fact a citizen of California rather than New York at the time Plaintiffs filed suit.

was a citizen of New York, California, or any state besides New Jersey at the time Plaintiffs filed their Complaint on September 22, 2011.  None of their submissions responds to any of the *McCann* factors; all they can show is that Marger maintained certain residences in California and New York in 2011.  The descriptions in her deposition testimony of trips made California bear none of the indicia that would allow the Court to infer that she ever *intended* to remain in California.  *See McCann*, 458 F.3d at 286 (stating that in order to change one's domicile, one must take up residence in a new domicile and intend to remain there).  Thus, Plaintiffs have failed to establish the presence of complete diversity of citizenship.  Therefore, the Court does not have diversity jurisdiction over Plaintiffs' state law claims.

### iii.    The Court will not exercise its supplemental jurisdiction

Having found that it has no subject matter jurisdiction over Plaintiff's state law claims, the Court must finally consider whether it should nonetheless exercise supplemental jurisdiction over them.  *See* 28 U.S.C. § 1367.  As an initial point, the Court exercises federal subject matter jurisdiction over Plaintiffs' federal RICO claim because such a claim "aris[es] under the . . . laws . . . of the United States."  *See* 28 U.S.C. § 1331.  Further, because Plaintiffs' state law causes of action were related to the federal RICO claim such that all claims formed "part of the same case or controversy under Article III of the United States Constitution,"[11] the Court properly exercised supplemental jurisdiction over these claims.  *See* 28 U.S.C. § 1367(a).

At this point, however, the Court has decided to grant Defendants' motion to dismiss Plaintiffs' sole federal claim.  In this case, the Court will decline to exercise jurisdiction over the remaining state law claims.  The statute specifically grants district courts discretion to decline the

---

[11] This phrase has been interpreted to embrace all claims which share a "common nucleus of operative fact."  *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 308 (3d Cir. 2003) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).  In this case, the parties do not appear to dispute that Plaintiffs' state law and federal law claims meet this standard.

exercise of supplemental jurisdiction in cases where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(1). In addition, the Court notes that, while this case was originally filed some time ago, it is still in its nascent states of development. The parties have not yet conducted meaningful discovery on the substance of Plaintiffs' claims. Further, the Court has yet to set any trial date. Thus, the Court sees no good reason to retain jurisdiction over Plaintiffs' remaining state law claims.

## V.     CONCLUSION

The Court is mindful of the fact that disputes arising out of testamentary proceedings can stir up a breadth and intensity of emotion not generally found in the typical civil action. Plaintiffs have pursued their claims in this court vigorously, and, judging from depth and range of the allegations they make in their filings to the Court, it is clear that they have sincerely-held beliefs that wrongdoing has occurred with respect to the administration of Sidney Rothberg's Estate. The Court, in reaching the resolution that it does here, notes that none of its grounds for dismissal precludes Plaintiffs from seeking in personam relief against some or all of the Defendants in a different court if Plaintiffs are successful in convincing the Pennsylvania Orphans Court of the validity of their allegations. Until then, however, Plaintiffs will have to direct their efforts to those state proceedings.

For the reasons stated above, the Court will grant Defendants' motion to dismiss all of Plaintiffs' claims. An appropriate order shall issue today.


Dated:    3/28/13                                    /s/ Robert B. Kugler
                                                     ROBERT B. KUGLER
                                                     United States District Judge